992 A.2d 89

**In re Alice G. NOVOSIELSKI, Deceased.**

**Appeal of Thomas V. Proch.**

Supreme Court of Pennsylvania.

Argued March 2, 2009.

Decided March 25, 2010.

512

Theodore F. Huckestein, Jr., Pittsburgh, for Thomas V. Proch.

John A. Modzelewski, for JAM.

John A. Modzelewski, Executor of the Estate of Helen Modzelewski, for John A. Modzelewski, Executor of the Estate of Helen Modzelewski.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice McCAFFERY.

Appellant, Thomas V. Proch, appeals from the order of the Superior Court, which affirmed the decree of the Westmoreland County Orphans' Court, directing Appellant, as executor of the Estate of Alice G. Novosielski ("Decedent"), to inventory with Decedent's estate the principal and proceeds of a United States Treasury account titled in Appellant's and Decedent's names. Because we conclude that both the Superior Court and orphans' court misinterpreted relevant provisions of the act known as the Multiple–Party Accounts Act ("MPAA"), 20 Pa.C.S. §§ 6301–6306, and failed to properly apply the MPAA's relevant provisions, we reverse.

The relevant factual and procedural history, taken from the decisions below and evidence of record where noted, is as follows. Decedent died testate on November 16, 2001, at the age of 79. Decedent's husband predeceased her in 1998, and the couple had no children. Decedent's will, dated June 12, 1995, provided that in the event her husband predeceased her, her estate would be divided equally among her five sisters, *per stirpes*. At the time of Decedent's death, only one sister was living, Helen Modzelewski, while others left surviving children.

At some point after she executed her will, Decedent began experiencing health problems and required assistance with household and personal needs. ˙ Appellant, who was the son of Decedent's deceased sister Loretta, began to provide such assistance, along with his wife, beginning in 1995, according to their uncontradicted testimony. Assistance was also provided by caregivers hired by Decedent and supervised by Appellant. On August 25, 2000, Decedent appointed Appellant her attorney-in-fact under a duly executed power of attorney. The power of attorney was drafted by James E. Kopelman, Esq., who later testified at the hearing in this case that he was comfortable with Decedent's decision to execute the power of attorney because he "felt that she had the capacity to do it[,] that she understood what she was signing[,] and that there was no undue influence." Master's Hearing, 11/16/05, at 396. Kopelman further testified that at the time, Decedent was "mentally ... still very, very sharp[,] ... knew what she wanted to do[, and] understood the Power of Attorney...." *Id.* at 394.

On September 15, 2000, shortly after she executed the power of attorney, Decedent executed a codicil to her will naming Appellant executor of her estate, appointing an alternative executrix, and granting specific bequests of $5,000 to each of these two individuals. In all other respects, the codicil ratified and republished Decedent's 1995 will. The codicil was prepared by Kopelman, who had also prepared the original will.

Four days later, on September 19, 2000, Decedent executed a United States Treasury Bill Tender ("the Tender"), with a non-competitive bid, or offer to buy, of $500,000. The Tender further provided that a "Treasury Direct" account was to be created in the account name of "Alice G. Novosielski or Thomas V. Proch." The "Investment Kit" that accompanied the Tender, and which explained the process and ramifications of the investment, indicated that an account in the names of two people joined by the word "or" creates a conclusive right of survivorship. Treasury Direct Investor Kit at 6; Master's Hearing Exhibit 2. Appellant, acting as Decedent's attorney-in-fact, had procured the Tender and Investment Kit in order

to consolidate Decedent's several existing financial accounts. Kopelman testified that Appellant had discussed with him the possibility of combining Decedent's various accounts into a Treasury Direct account, and that Kopelman had advised Appellant that he "was on the right track" for two reasons: the relatively low FDIC insured limits on the other accounts, and ease of administration of one account. Master's Hearing, 11/16/05, at 399. Later, the master specifically found as a fact that Decedent had directed Appellant to place the Treasury Direct account in the names of Decedent *or* Appellant after she had had an opportunity to review the Investment Kit prior to her executing the Tender, including that portion of the Investor Kit explaining the different ways of registering accounts and their ramifications. Master's Report and Recommendation ("Master's Report"), dated July 7, 2006, at 2.

The Tender had an initial thirteen-week investment term and authorized automatic reinvestment in the bill for the next three succeeding thirteen-week terms, for a total term of one year. At the conclusion of the final thirteen-week investment term, Appellant, acting under the power of attorney, unilaterally authorized a further one-year reinvestment of the account holdings without consulting Decedent. Approximately two months after Appellant reinvested the account holdings for a further one-year term, Decedent died.

On December 11, 2002, Appellant, then acting in his role as executor of Decedent's estate, filed a first and final account of the estate, excluding from the estate's property the value of the Treasury Direct account. Decedent's surviving sister, Helen Modzelewski, filed objections to the account, contending that the Treasury Direct account should be listed as property of the estate. Appellant thereafter filed an amended first and final account of the estate; however, he continued to exclude from it the Treasury Direct account. In the interim, Helen had died, and John Modzelewski ("Appellee"), Helen's son and administrator of his mother's estate, filed objections to Appellant's amended first accounting, raising the additional argument that Appellant had abused his role as attorney-in-fact by misappropriating or misusing approximately $90,000 of Decedent's funds.

The orphans' court appointed a special master to take testimony and issue a report and recommendation on the filed objections. Following four days of hearings, during which evidence was admitted concerning Decedent's mental and physical condition prior to, at, and after the execution of the Tender,[1] the master issued a report and recommendation that determined (1) Appellant should be surcharged $96,059 because he had breached his fiduciary duty by making various payments from Decedent's funds beyond the powers conferred by the power of attorney and/or for not keeping proper records of these transactions; and (2) Appellant was the sole owner of the Treasury Direct account. Regarding the latter determination, the master found, based on testimony given by Kopelman and other witnesses, that Decedent had possessed the mental acuity to make a knowing execution of the Tender; that "[D]ecedent understood that [Appellant] would be the sole owner of the Treasury Direct account upon her death;" and that "even if the Power of Attorney had established a confidential relationship, [Appellant] has proven by his credible testimony that the creation of the joint Treasury Direct Account was the free, voluntary and intelligently made transfer of [Decedent]." *Id.* at 2, 21. Appellant and Appellee filed cross-exceptions with the orphans' court.[2]

The orphans' court adopted the master's recommendation in part and reversed in part without making additional findings of fact or specifically rejecting those findings made by the master. The court agreed with the master that Appellant should be surcharged $96,059 for questionable or undocumented transfers of funds made pursuant to his power of attorney.[3] However, the court disagreed with the master's

1. As shall be discussed *infra*, this evidence revealed that Decedent had suffered from serious mental difficulties of varying kinds the year prior to and the year following the time that she executed the power of attorney, codicil, and the Tender.

2. We note that Appellee was represented by counsel at the master's hearing, but thereafter acted *pro se*.

3. The issue of the surcharge against Appellant is not on appeal before this Court.

conclusion that Appellant, and not the estate, was the owner of the Treasury Direct account.

In arriving at this contrary conclusion, the court considered relevant provisions of the MPAA, in particular, Section 6304(a). That section provides:

(a) **Joint account.**—*Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created.* If there are two or more surviving parties, their respective ownerships during lifetime shall be in proportion to their previous ownership interests under section 6303 (relating to ownership during lifetime) augmented by an equal per capita share for each survivor of any interest the decedent may have owned in the account immediately before his death; and the right of survivorship continues between the surviving parties.

20 Pa.C.S. § 6304(a) (emphasis added).

The court did not conduct an analysis concerning, or make a conclusive determination as to, whether the Treasury Direct account is a joint account as defined, and thus governed, by the MPAA. Rather, the court determined that *even if* the Treasury Direct account was governed by the MPAA, clear and convincing evidence of record rebutted the presumption of survivorship. The court reasoned:

Accepting [Appellant's] own testimony, [Decedent's] intent at the time the account was created was that the money would be used for her care, depending on how long she lived. [Appellant] testified that the account was created as an 'interest pump that would supplement [Decedent's] salary [sic] to pay for her care.' The interest earned on the account was automatically deposited to [Decedent's] individually titled National City [Bank] account, and was reported on her tax returns. Pursuant to the terms of the [I]nvestor [K]it, when the securities matured, the funds were to be automatically deposited into [Decedent's] individually titled National City account. The above evidence is sufficient to

rebut the survivorship presumption, by clear and convincing evidence, as the account was obviously a 'convenience account' and was not intended as a present gift of the monies to [Appellant] at the time the account was created.

Orphans' Court Opinion, dated January 8, 2007, at 4–5 (citations to the record and footnote omitted).[4]

Appellant appealed, and the Superior Court affirmed, albeit on different grounds from those of the orphans' court. First, the Superior Court directly addressed the issue of whether the Treasury Direct account was a "joint account" as defined and governed by the MPAA.[5] The Superior Court noted that "[t]here is no dispute [D]ecedent was a 'depositor' for purposes of the MPAA definition of 'account,'" or "that the Federal Reserve Bank responsible for administering [D]ece-

4. The court also determined that the record failed to support the conclusion that the Treasury Direct account was an *inter vivos* gift from Decedent to Appellant. *Id.* at 5–8. The court cited *Estate of Buriak v. Sperl*, 342 Pa.Super. 371, 492 A.2d 1166, 1168 (1985), for the proposition that where a confidential relationship exists between the donee and donor, the burden shifts to the donee to prove by clear and convincing evidence that the conveyance was the free, voluntary, and independent act of the donor. The court determined that Appellant's status as attorney-in-fact, as well as his extensive involvement in the management of Decedent's substantial financial estate and his intimate involvement with Decedent's daily care and comfort, established the existence of such a confidential relationship. The court then concluded that Appellant had failed to prove by the requisite quantum of proof that Decedent had intended to make an *inter vivos* gift of the Treasury Direct account. The court reiterated its conclusion that the account was merely a "convenience account" for Decedent's care during her lifetime, and further determined that while testimony of record supported the conclusion that Decedent wished Appellant to have the account upon her death, the formal requirements for a testamentary disposition were lacking. *Id.* at 8. The testimony that the orphans' court was referring to was apparently Appellant's testimony that Decedent had directed him to create the Treasury Direct account in the names of Decedent *or* Appellant, so that upon her death, the Treasury Direct account would be his. Master's Hearing, 11/14/05, at 79.

5. The MPAA defines an "account" as "a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, saving account, certificate of deposit, share account and *other like arrangements.*" 20 Pa.C.S. § 6301 (emphasis added). The MPAA defines "joint account," in turn, as "an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship." *Id.*

518

dent's treasury account is a 'financial institution' for purposes of section 6301." *In re Estate of Alice G. Novosielski*, 937 A.2d 449, 453 (Pa.Super.2007).[6] Noting that the Treasury Direct account was not "a checking account, saving account, certificate of deposit, [or] share account," as specifically delineated in Section 6301 of the MPAA, the court pursued the next avenue of inquiry, *i.e.*, whether the Treasury Direct account was an "other like arrangement." *Id.* (quoting 20 Pa.C.S. § 6301). In exploring this issue, the court examined our plurality decision in *Deutsch, Larrimore & Farnish, P.C. v. Johnson*, 577 Pa. 637, 848 A.2d 137 (2004) (plurality), wherein this Court determined that a Morgan Stanley/Dean Witter brokerage account was an "other like arrangement" as contemplated by Section 6301 of the MPAA. After examining both the plurality position, authored by former Justice Newman, and the concurring position, authored by Justice Saylor, the Superior Court concluded that under either analysis, the conclusion was inescapable that the Treasury Direct account was "indeed, an 'account' for purposes of the MPAA." [7] *Novosielski, supra* at 454. Additionally, the Superior Court determined that the Treasury Direct account fit the MPAA definition of "joint account." The court stated: "By virtue of the account being titled with the designation 'Alice G. Novosielski or Thomas V. Proch,' a title that employs the connective 'or,' both [D]ecedent and [A]ppellant had the authority to authorize transactions with the account pursuant to the terms of the [Investor K]it." *Id.* at 455.

Having determined that the Treasury Direct account was a "joint account" for purposes of Section 6304(a) of the MPAA,

6. The MPAA defines "financial institution" as "any organization authorized to do business under State or Federal laws relating to financial institutions, including, without limitation, banks and trust companies, savings banks, building and loan associations, savings and loan companies or associations and credit unions." 20 Pa.C.S. § 6301. However, we note that the Superior Court's assertion that there is "no dispute" that the Federal Reserve Bank is a "financial institution" for purposes of Section 6301, is belied by Appellee's *pro se* Superior Court Brief at 34 ("Federal reserve is not an MPAA 'financial institution'. . . .").

7. We shall discuss *infra* the analysis of both the *Deutsch* plurality and concurring opinions in detail.

the Superior Court "started" with the presumption that the funds in the account belonged to Appellant, citing 20 Pa.C.S. § 6304(a), Jt. St. Govt. Comm. Comment ("The underlying assumption is that most persons who use joint accounts want the survivor or survivors to have all balances remaining at death."). The Superior Court then considered whether Appellee was able to prove by clear and convincing evidence that Decedent had a different testamentary intent when the Tender was executed. 20 Pa.C.S. § 6304(a) ("Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent *unless there is clear and convincing evidence of a different intent at the time the account is created.*") (emphasis added).

The Superior Court, in determining that "clear and convincing evidence of a different intent" did exist, focused upon the fact that contemporaneously with the Tender being executed, Decedent had also ratified her 1995 will through the 2000 codicil. The court observed: "The will left approximately one-tenth (1/10) of [D]ecedent's estate to [A]ppellant, which is a far lesser share than the approximate four-fifths (4/5) share [A]ppellant would receive if he were found to be the owner of the treasury account." *Novosielski, supra* at 457. The court further reasoned:

> When the execution of a valid will pre-dates the creation of a challenged MPAA joint account, we must consider whether the intentions expressed in the will can be read in a manner that is consistent with the decision to place assets in the MPAA joint account. If we cannot find such consistency[,] *the expression of intent in the will must control* unless we determine that the creation of the joint account functions as a revocation of the validly executed will.

*Id.* (emphasis added; footnote omitted).

In essence, the Superior Court felt compelled to read the provisions of the MPAA in *pari materia* with those of other sections of the Probate, Estates, and Fiduciaries ("PEF") Code regarding the creation and revocation of wills. *Id.* "To apply the [MPAA joint account] ownership presumption would

be, for all practical purposes, to use section 6304(a) to revoke the prior will in a manner not contemplated by our statutory scheme." *Id.* The court observed:

> We must give effect to the will. To conclude otherwise would lead to the frustration of testamentary intent and could result in fraud. Decedent's 1995 will and the 2000 codicil are precisely the form of clear and convincing evidence section 6304(a) contemplates a challenger must produce in defeating the presumption of ownership of a joint account. By its very nature, a validly executed will is the clearest and most convincing evidence of a decedent's intent that can be produced.

*Id.*

The Superior Court then set forth its own assessment of what had transpired between Appellant and Decedent, characterizing Appellant as an "opportunist who abused his position as [D]ecedent's attorney-in-fact,"[8] who had given the Tender and Investment Kit to Decedent when she was enfeebled with "a perilous mental condition." *Id.* at 458. In arriving at this latter conclusion, the Superior Court disregarded the master's factual findings, undisturbed by the orphans' court, that Decedent had been mentally competent and sharp at or near the time she had executed the Tender in September 2000. Rather, the Superior Court observed that evidence of record purportedly showed that Decedent had "been diagnosed with being in an acute confusional state replete with hallucinations, delusional disorder, and with psychotic depression by a clinical psychologist in October of 1999, which degenerated into senile dementia by September 2001." *Id.* (citing evidence of record). The Superior Court, *without* citing to any evidence of record, also stated that Appellant "executed the treasury account tender with his own hand, and excluded other members of the family and heirs under the 1995 will and 2000 codicil from the management of [D]ecedent's day to day affairs." *Id.*[9]

---

**8.** This characterization was based upon the fact that Appellant had been surcharged $96,059 for questionable or undocumented transfers of funds made pursuant to his power of attorney.

**9.** The Superior Court did not appear to draw any further conclusions from its statements. It then simply came to its conclusion that the

However, no factual findings or comments by either the master or the orphans' court support the assertions that Decedent was not mentally competent at the time she executed the Tender, that Appellant had actually written Decedent's signature on the Tender, or that Appellant had excluded other family members and heirs from Decedent's daily life. In fact, the master's factual findings, undisturbed by the orphans' court, lead to a contrary conclusion on these matters. Moreover, there exists evidence of record contrary to the "observations" of the Superior Court as to these matters; thus, the Superior Court's assessments were not based on undisputed evidence.

We granted Appellant's Petition for Allowance of Appeal to address the following issues:

(1) By applying state law to override federal treasury regulations, is the Superior Court's award of the joint treasury account to the decedent's estate precluded by the Supremacy Clause of the United States Constitution?

(2) Did the Superior Court err in holding that the presumption of survivorship under 20 Pa.C.S.A. § 6304(a) is defeated, *per se*, if the joint account results in an allocation of the estate that is inconsistent with an existing will?

(3) Did the Superior Court err in determining, under 20 Pa.C.S.A. § 6304(a), that there was clear and convincing evidence of a different intent at the time the account was created?

(4) Did the Superior Court err in failing to accord the factual findings of the master the same weight and effect as a jury verdict?

Preliminarily, and with due regard to the parties who were asked to brief and argue this issue, we conclude that the first issue must be dismissed as having been improvidently granted. Evidently, the issue as stated assumes a circumstance that had never occurred. No court below "overrode" purport-

orphans' court had reached the correct legal result "even though it fail[ed] to take the most direct analytical route." *In re Estate of Alice G. Novosielski,* 937 A.2d 449, 458 (Pa.Super.2007).

edly applicable federal treasury regulations by applying state law in their stead, for the simple reason that the parties never invoked federal regulations in their arguments and the courts did not raise the issue *sua sponte.* Neither Appellee in his exceptions to the master's report,[10] nor Appellant in his appeal from the decree of the orphans' court, raised an issue regarding the applicability of federal treasury regulations in any capacity or guise.[11] No mention of federal treasury regulations occurred in the respective decisions of the master, orphans' court, and Superior Court. Thus, the issue also suffers from the impediment of having been apparently waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

We have found support from at least one other jurisdiction for the proposition that a claim of state law *preemption* by federal law is of such fundamental importance that it may be considered for the first time on appeal. *Oatts v. Jorgenson,* 821 P.2d 108, 112 (Wyo.1991). However, unless Congressional legislation has explicitly preempted state law or implicitly intended to occupy the relevant field to the exclusion of state law, federal preemption occurs only where a state law actually conflicts with federal law. *Dooner v. DiDonato,* 601 Pa. 209, 971 A.2d 1187, 1193–94 (2009); *Cellucci v. General Motors Corp.,* 550 Pa. 407, 706 A.2d 806, 809 (1998). State law may be displaced under conflict preemption principles when

10. Appellee states in his *pro se* brief, without citation to the record, that he has "consistently argued" that the MPAA cannot be applied to a United States Treasury security and that the application of the MPAA to the Treasury Direct account in this case is a Supremacy Clause violation. Appellee's Brief at 9 n. 8. However, as previously stated, Appellee never raised this issue in his exceptions to the master's report. Further, although Appellee in his *pro se* brief before the Superior Court did argue that the MPAA did not apply to the Treasury Direct account, Appellee did not set forth a Supremacy Clause argument, nor did he cite to any purportedly applicable federal regulations. *See* Appellee's Superior Court Brief at 34.

11. Appellant first raised this claim in his Petition for Allowance of Appeal. In his Superior Court brief, Appellant argued that the Treasury Direct account was governed by the MPAA. *See* Appellant's Superior Court Brief at 35–42.

the state law stands as an *obstacle* to the accomplishment and execution of the full purposes and objectives of Congress. *Jones v. Rath Packing Co.*, 430 U.S. 519, 526, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). "This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Id.*

■ Here, the parties have not argued that Congressional legislation has *explicitly* preempted the MPAA or *implicitly intended to occupy the relevant field* to the exclusion of the MPAA. Further, the federal regulations that appear to be applicable to this matter do not pose a conflict with the MPAA with respect to the issue of right of survivorship. The MPAA relevantly provides: "Any sum remaining on deposit at the death of a party to a joint account belongs to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intent at the time the account is created." 20 Pa.C.S. § 6304(a). This result is essentially mirrored in 31 C.F.R. § 357.21, a federal regulation pertaining to Treasury Direct accounts, which provides that when a security is registered in the names of two individuals joined by the word "or," it creates a *conclusive* right of survivorship.[12] Case law indicates that the conclusive right of survivorship may be defeated by a showing of fraud or breach of trust. *Yiatchos v. Yiatchos,* 376 U.S. 306, 84 S.Ct. 742, 11 L.Ed.2d 724 (1964); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (both pertaining to regulations that created a right of survivorship in United States savings bonds). Because of our ultimate determination that Appellant is the sole owner of the Treasury Direct account under Section 6304(a) of the MPAA, there is no conflict with 31 C.F.R. § 357.21, which would require the same result.[13]

12. As previously noted, the information set forth in the Investment Kit explains that accounts in the name of two persons connected by the word "or" creates a "conclusive" right of survivorship and, thus, as a practical matter, the effect of the regulation is evident in the record.

13. Although Appellee argues that the record supports a finding of fraud (*see* Appellee's Brief at 12–14), no such finding was made below, nor was there any finding regarding a breach of trust with respect to the creation of the Treasury Direct account.

■■ Moreover, there exists a presumption *against* federal preemption of state law. *Dooner, supra* at 1194; *Altria Group, Inc. v. Good,* 555 U.S. 70, ——, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008). The historic police powers of the states are not to be superseded by federal law unless that is the clear and manifest purpose of Congress. *Dooner, supra.* With this principle in mind, and because the parties have failed to set forth an argument that would compel the application of federal preemption in this matter, an issue waived below, we dismiss the first stated issue as having been improvidently granted. Moreover, our ultimate disposition of the next two issues obviates our need to address the final issue accepted for review, concerning whether a master's factual findings are the equivalent of a jury verdict. Thus, we shall also not address issue four. We thus proceed to address issues two and three, in turn. Because the resolution of these issues concerns questions of law, our standard of review is *de novo* and our scope of review is plenary. *In re Milton Hershey School,* 590 Pa. 35, 911 A.2d 1258, 1261 (2006).

■ Issues two and three involve whether the Superior Court properly interpreted the MPAA. Before we can resolve these issues, we must first determine whether the Superior Court correctly concluded that the Treasury Direct account is a "joint account" governed by the MPAA, a conclusion that, contrary to language found in the Superior Court opinion, Appellee has disputed and continues to dispute.

The MPAA defines "account" as "a contract of deposit of funds between a depositor and a financial institution, and includes a checking account, saving account, certificate of deposit, share account and other like arrangements." 20 Pa.C.S. § 6301. A "joint account" is defined as "an account payable on request to one or more of two or more parties whether or not mention is made of any right of survivorship." *Id.* "Financial institution" is defined as "any organization authorized to do business under State or Federal laws relating to financial institutions, including, without limitation, banks and trust companies, savings banks, building and loan associa-

tions, savings and loan companies or associations and credit unions." *Id.*

In *Deutsch, supra,* a plurality and concurrence of this Court, constituting a majority of the Court, determined that a joint Morgan Stanley/Dean Witter brokerage account was a joint account as defined by the MPAA. In coming to this conclusion, both the plurality and concurrence noted that the MPAA's definitions of "account" and "financial institution" are *very broad. See id.* at 141–42 (plurality decision); and 144–45 (Saylor, J. concurring). The plurality determined that the brokerage account was encompassed within the statutory definition of "share account and other like arrangements." *Id.* at 141 (quoting 20 Pa.C.S. § 6301). Further, the plurality observed that the MPAA's broad definition of "financial institution" included brokerage firms, particularly as some state and federal statutes specifically include brokerage firms within their definitions of "financial institutions." *Id.* at 142. The concurrence determined that the characteristics of the brokerage account were more similar to those of a traditional "bank account" rather than a "share account." *Id.* at 144–45. The concurrence additionally observed that the record showed that the brokerage firm provided a wide range of financial services, thus supporting the conclusion that it was a "financial institution" as defined by the MPAA. Further, the concurrence noted that because the MPAA so broadly defined "financial institution," whereas in other statutes the General Assembly had provided a more restrictive definition of "financial institution," it was "at least arguable that the more open-ended definition contained in the [MPAA] was intended to sweep more broadly." *Id.* at 146. Moreover, as the plurality observed, the broad definitions encompassed by the MPAA established that *"virtually all 'fund deposit' transactions with 'financial institutions' doing business pursuant to state and federal laws are affected by the MPAA." Id.* at 140 (plurality decision) (emphasis added).

The task of determining whether the Treasury Direct account at issue in this case falls within the ambit of the MPAA would appear to be considerably less difficult than the deter-

mination of whether a brokerage account falls within it. Here, there was clearly a "deposit of funds" made by Decedent that, in turn, created an "account." As the Superior Court correctly noted, the record showed that although Decedent's investment was in a United States Treasury Bill, that bill was neither presented to the two account holders nor titled in their names. Rather, the bill generated income that was, by direction, paid into a bank account held by Decedent, and upon termination of the Treasury Direct account, the principal and remaining interest would be returned to Decedent. *Novosielski, supra* at 455. Thus, the Treasury Direct account bore some resemblance to a "certificate of deposit," in that it was a timed renewable investment, and we have no hesitation in concluding that the Treasury Direct account was an "other like arrangement" as contemplated by the MPAA. *See* 20 Pa.C.S. § 6301; *see also Deutsch, supra* (Saylor, J. concurring) (concluding that an "account" that bears resemblance to a bank account falls within the MPAA's definition of "account"); and *Balazick v. Ireton,* 518 Pa. 127, 541 A.2d 1130, 1132 (1988) (repurchase agreements designed to provide for the parents' lifetime support with a right of survivorship in their children and titled in the name of the respective parent "or" the respective child, "was not unlike a share account or certificate of deposit" and was, thus, a "joint account" as defined by the MPAA).

Furthermore, there would seem to be no question that the area Federal Reserve Bank that held the Treasury Direct account is a "financial institution" as defined by the MPAA. The Federal Reserve Act's definition of "bank" includes the Federal Reserve Banks. 12 U.S.C. § 221. The powers conferred upon Federal Reserve Banks include "all powers specifically granted by the provisions of [the Federal Reserve Act] and such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by [the Federal Reserve Act]," as exercised through their "board[s] of directors, or duly authorized officers or agents." 12 U.S.C. § 341 (Seventh). "The [twelve area] Federal Reserve Banks were established by Congress in 1913 to be the

monetary and fiscal agents of the United States. To aid in achieving Congress's goal of insulating them from political pressure, the Federal Reserve Banks are formed as corporations. Within their respective designated territories, the Federal Reserve Banks supervise and maintain the nation's banking system, examine the national and state banks that have purchased memberships in the Federal Reserve System, and clear checks and deposits between depository institutions." *Fasano v. Federal Reserve Bank of New York,* 457 F.3d 274, 277 (3d Cir.2006) (citations, quotation marks, and footnote omitted).

The Federal Reserve Bank is plainly an "organization authorized to do business under ... Federal law[ ] relating to financial institutions," and is, in fact, a bank. *See* 20 Pa.C.S. § 6301. Thus, it is a "financial institution" as defined by Section 6301 of the MPAA. Moreover, there appears to be absolutely no dispute that the Treasury Direct account at issue here was "an account payable on request to one or more of two ... parties whether or not mention is made of any right of survivorship." *Id.* (defining "joint account"). Accordingly, we conclude that the Treasury Direct account, meeting the MPAA's definition of "joint account," is governed by the provisions of the MPAA. Thus, we now proceed to address the second issue accepted for review: "Did the Superior Court err in holding that the presumption of survivorship under 20 Pa.C.S.A. § 6304(a) is defeated, *per se,* if the joint account results in an allocation of the estate that is inconsistent with an existing will?"

Section 6304(a) of the MPAA would grant to Appellant the right to survivorship in the Treasury Direct account "unless there is clear and convincing evidence of a different intent at the time the account is created." 20 Pa.C.S. § 6304(a). Our seminal question, therefore, is whether the Superior Court erred by concluding that the provisions of Decedent's will, together with Decedent's ratification of that will by codicil near the time of the creation of the Treasury Direct account, constituted clear and convincing evidence that Decedent did not intend there to be a right of survivorship at

the time the account was created. The Superior Court stated that in order to analyze whether "clear and convincing evidence of a different intent" existed, it was necessary to "consider whether the intentions expressed in [a pre-existing] will can be read in a manner that is consistent with the decision to place assets in [an] MPAA joint account," giving primacy to the will should there be any "inconsistency." *Novosielski, supra* at 457. We conclude that the Superior Court erred.

There is no statutory provision giving a will primacy over the right of survivorship presumed by Section 6304(a), nor does anything in the MPAA or the PEF Code support the Superior Court's path of interpretation. Indeed, the MPAA clearly evinces a legislative intent that joint accounts are to be generally governed and interpreted separate and apart from provisions governing wills. Section 6306 of the MPAA provides: "No transfer resulting from the application of section 6304 (relating to right of survivorship) shall be considered as testamentary *or subject to* Chapter 21 (relating to intestate succession) or *Chapter 25 (relating to wills )*." 20 Pa.C.S. § 6306 (emphasis added). The comment to section 6306 provides:

> This section is derived from Section 6–106 of the Uniform Probate Code. The Commissioners' comment to that section states, in part, that:

> The purpose of classifying the transactions contemplated by [this chapter] as nontestamentary is to bolster the explicit statement that their validity as effective modes of transfers at death is *not* be determined by the requirements for wills. The section is consistent with [existing law].

20 Pa.C.S. § 6306, Jt. St. Govt. Comm. Comment—1976 (emphasis added).

Further, Section 6304(d) provides: **"Change by will prohibited.**—A right of survivorship arising from the express terms of an account or under this section, or a beneficiary designation in a trust account cannot be changed by will." 20 Pa.C.S. § 6304(d). It is unclear whether Section 6304(d)

refers only to wills made subsequent to the creation of the joint account, or whether it encompasses wills made both prior and subsequent to the creation of the account. If it encompasses wills made both prior and subsequent to the creation of the account, then the Superior Court's holding is plainly contrary to statute. However, even if Section 6304(d) applies only to wills made subsequent to the creation of joint accounts, this section only reinforces the conclusion that the legislature did not intend that the MPAA be read to conform to the provisions in the PEF Code governing wills.[14] On the contrary, the MPAA rather clearly evidences a legislative intent that, except when the instrument explicitly provides to the contrary or in the unusual case based on a heightened degree of evidence, individuals and institutions may safely rely upon the presumed right of survivorship of MPAA joint accounts.

We do not hold that provisions of a will, in the appropriate case and in conjunction with other relevant evidence, are beyond consideration as "clear and convincing evidence" of intent different from a right to survivorship "at the time [a joint] account is created." However, the Superior Court's conclusion that such clear and convincing evidence exists simply when a court determines that the provisions of a pre-existing will indicate a distribution scheme in conflict with one under a co-existing joint account is not supportable under a plain reading of the MPAA or otherwise.[15]

As we held in a case wherein we were asked to determine whether a decedent's actions prior to death destroyed a right of survivorship established in a joint bank account:

A joint tenancy with right of survivorship having been created and not terminated at the death of one tenant, the

14. The Superior Court opinion discusses neither Section 6304(d) nor 6306.

15. We additionally note that the Superior Court failed to give weight to various circumstances consistent with the statutory presumption of a right of survivorship. The Superior Court indicated that courts should not consider proofs tending to bolster such presumption in assessing whether an intent contrary to right of survivorship has been proven by clear and convincing evidence. *See Novosielski, supra* at 456. We reject this premise, as it would encourage courts to disregard potentially relevant evidence.

law is too well settled to be gainsaid. The Orphans' Court properly held that the funds passed outside the estate to the party having the right of survivorship.

*Estate of Allen,* 488 Pa. 415, 412 A.2d 833, 838 (1980) (footnote omitted).

■■ Further, as we more recently stated:

One who knowledgeably creates a joint account with another arguably does so with the present intent to employ the account's survivorship characteristic in substitution for a testamentary device. Furthermore, accounts with right of survivorship provisions are often set up to allow caretakers to assist senior citizens with the management of their finances.[16] Their well-planned financial protection can best be honored by adhering to the statutory presumption[s].... Like other testamentary devices, creation of a joint account, without more, accomplishes no present transfer of title to property. If, as in this case, one person deposits all sums in the joint account, this arrangement contemplates transfer of title to those funds to the other person or persons named on the account upon the death of the depositor. Moreover, the creator of a joint account, like the maker of a will and unlike the giver of a gift, may change his or her mind prior to death.

*Deutsch, supra* at 143–44 (plurality).[17]

The latter point made by the plurality in *Deutsch* is significant. It is axiomatic that an individual may generally use and dispose of his or her property as he or she wishes. Thus, a beneficiary would typically have no valid claim against a third

16. This is precisely what had happened in the case *sub judice.*

17. *See also* 20 Pa.C.S. § 6303, Jt. St. Govt. Comm. Comment—1976 ("The theory of these sections is that the basic relationship of the parties is that of individual ownership of values attributable to their respective deposits and withdrawals; the right of survivorship which attaches unless negated by the form of the account really is a right to the values theretofore owned by another which the survivor receives for the first time at the death of the owner. That is to say, the account operates as a valid disposition at death rather than as a present joint tenancy.") (quoting the Commissioners' comment to Section 6–103 of the Uniform Probate Code and quoted in *Deutsch, supra* at 143 (plurality)).

person should a decedent reduce the estate during the decedent's lifetime by bestowing upon that third person the decedent's possessions. That is what essentially happened in this case. Decedent reduced the extent of her property (significantly) by placing $500,000 of her assets in the Treasury Direct account and, by the manner of titling the account, created a right of survivorship in Appellant. Had Decedent lived longer, the proceeds of the Treasury Direct account presumably would have been depleted by expenditures for her care. As it happens, she died just slightly more than one year after creation of the account, leaving the bulk of the account intact. Rather than focusing upon the fact that Decedent had died with a substantial portion of her property passing directly to Appellant, the Superior Court should have simply determined whether the account by its own terms, and without clear and convincing evidence of a contrary intent, created a right of survivorship. We therefore hold that the Superior Court erred by concluding that a right of survivorship created by a joint account governed by the MPAA is defeated merely because provisions of a will would distribute a decedent's property in a different manner.

We thus move to the third issue accepted for review, *i.e.*, whether the lower courts erred in concluding that there was *any manner of* clear and convincing evidence of a different intent than one of right of survivorship at the time the Treasury Direct account was created. As we have just concluded, it was inappropriate for the Superior Court to use Decedent's will, as well as the fact of her subsequent ratification of the will, as the "clear and convincing evidence" required by Section 6304(a) to establish an intent other than one of right of survivorship. However, the Superior Court also either articulated an alternative basis for its holding or focused on other grounds in justifying its conclusion that the provisions of Decedent's will defeated Appellant's right of survivorship in the Treasury Direct account. Specifically, the Superior Court engaged in a discussion concerning Decedent's purported "perilous mental condition" and Appellant's role as "an opportunist" who stood in a confidential relationship with

Decedent. *Novosielski, supra* at 458.[18] Whether the court was embarking on alternative grounds for its holding, or whether it was simply illustrating what it deemed to be "the problems that could arise if [courts] were to ignore valid wills executed prior to the creation of challenged MPAA accounts by *blindly deferring* to the [S]ection 6304(a) ownership presumption" (*id.* at 457; emphasis added), our conclusion remains the same. The Superior Court inappropriately engaged in fact-finding.

Although there is evidence in the record concerning Decedent's psychiatric history in the form of medical records,[19] the Superior Court's statement that Decedent was in a "perilous mental condition" directly conflicts with the master's factual finding, left undisturbed by the orphans' court, and based on testimony taken at the hearing and found credible, that Decedent possessed the mental sharpness to make a knowing execution of the Tender. Master's Report at 13.[20] In his *pro se* exceptions to the Master's Report, Appellee stated that the Master's Report "failed to state" the contents of unspecified medical records concerning Decedent's psychiatric condition,

18. Curiously, the Superior Court failed to notice the glaringly irreconcilable conflict in its reasoning. If, as the Superior Court speculates, Decedent was in a "perilous mental condition" when she created the Treasury Direct account, then almost certainly she would have been in the same condition four days earlier when she executed the codicil upon which the Superior Court relied, in part, to show clear and convincing evidence of an intent different from right of survivorship.

19. No mental health professional and no medical professional testified at the hearing.

20. Further, although the Superior Court cites to medical documents of October 1999 and September 2001, the Superior Court does not mention those medical records closest in time to when Decedent created the Treasury Direct account in September 2000. Those records show that although Decedent suffered at that time from a major depression and a change in cognitive skills, of which she was aware, she was nevertheless "[a]lert and oriented to time, place and person." Psychiatric Consultation of R.S. Sandhu, M.D., dictated July 14, 2000, at 1. There was no finding of psychosis or senility at the time of this evaluation, and the psychiatric consultation was apparently made in connection with Decedent's hospital admission to treat weakness and diarrhea. *Id.; see also* Medical Notes of S.S. Bajwa, M.D., dated August 9, 2000 and October 9, 2000, which note Decedent's history of psychosis but show no then-present complaints or findings regarding a mental disability.

comments made by Appellant concerning Decedent's condi-
tion, and findings concerning Decedent's physical condition.
[Appellee's] Exceptions to Master's Report at 6. Although
Appellee did not specifically state as much, it appears that he
was arguing that the master capriciously disregarded evidence
concerning Decedent's mental condition; however, Appellee
failed to contend that this evidence amounted to "clear and
convincing evidence" of Decedent's incapacitated mental state
at the time of the creation of the Treasury Direct account.
Moreover, Appellee failed to set forth *any* argument as to how
exactly the Master erred by relying on eyewitness testimony
concerning Decedent's mental state contemporaneous with the
creation of the Treasury Direct account in September 2000,
rather than on medical records from either 1999 or 2001, and
why the orphans' court was required to overturn the master's
credibility determinations. Notably, the orphans' court, in its
adjudication, made no finding and engaged in no discussion
concerning Decedent's mental condition, and did not overturn
the master's finding regarding Decedent's mental state at the
time of the creation of the Treasury Direct account.

"Absent extraordinary circumstances, an appellate
court will not substitute its judgment for that of the fact-
finder." *Commonwealth v. Johnson,* 600 Pa. 329, 966 A.2d
523, 526 (2009); *see also Department of Transportation, Bu-
reau of Traffic Safety v. O'Connell,* 521 Pa. 242, 555 A.2d 873,
876 (1989) (concluding that an appellate court exceeds its
scope of review when it chooses to accept and reject portions
of the record and, in effect, makes its own findings of fact).
Because the master, based on testimony he found to be
credible, here determined that Decedent was mentally capable
of establishing the Treasury Direct account at the time of its
creation, and in the manner that she had, and because the
orphans' court did not disturb the master's relevant findings
or determination, it was improper for the Superior Court to
"find" that Decedent suffered from mental confusion and thus
conclude that the Treasury Direct account's right of survivor-
ship must be set aside for that reason.[21]

21. We need not, and do not, decide at this time to what extent the
mental state of a holder of an account governed by the MPAA can

We turn next to the reasons the orphans' court set forth for determining that clear and convincing evidence of an intent other than right of survivorship existed. The orphans' court determined that because the Treasury Direct account "was obviously a 'convenience account' [intended for Decedent's care during her lifetime] and ... not intended as a *present gift* of the monies to [Appellant] at the time the account was created," the presumption of a right to survivorship was rebutted by clear and convincing evidence. Orphans' Court Opinion at 5 (emphasis added).

The reasons given by the orphans' court are wholly at odds with the MPAA and our interpretation of its provisions. First, the MPAA makes clear that joint accounts with a presumed right of survivorship are not treated as *inter vivos* gifts from one account holder to another. Rather, the MPAA plainly provides: "A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sum on deposit, unless there is clear and convincing evidence of a different intent." 20 Pa.C.S. § 6303(a). As the official comment to Section 6303 states:

> The theory of these sections is that the basic relationship of the parties is that of individual ownership of values attributable to their respective deposits and withdrawals; the right of survivorship which attaches *unless negated by the form of the account* really is a right to the values theretofore owned by another which the survivor receives for the first time at the death of the owner. That is to say, the account operates as a valid disposition at death rather than as a present joint tenancy.

20 Pa.C.S. § 6303(a), Jt. St. Govt. Comm. Comment—1976 (quoting the Commissioners' comment to Section 6–103 of the Uniform Probate Code) (emphasis added). Thus, the focus of the MPAA with respect to joint accounts is not whether the creator of the account intended a "present gift" of monies, but whether the account created a right of survivorship.

establish the clear and convincing evidence necessary to defeat the presumed right of survivorship created by Section 6304(a).

Second, as we stated in *Deutsch*, joint accounts with rights of survivorship are *typically created* as "convenience accounts" to allow caretakers to assist senior citizens with the management of their finances. "Like other testamentary devices, creation of a joint account, without more, accomplishes no present transfer of title to property. If ... one person deposits all sums in the joint account, this arrangement contemplates transfer of title to those funds to the other person or persons named on the account upon the death of the depositor. Moreover, the creator of a joint account, like the maker of a will and *unlike the giver of a gift*, may change his or her mind prior to death." *Deutsch, supra* at 144 (plurality; emphasis added).[22] In *Deutsch*, we determined that, pursuant to Sections 6303 and 6304(a) of the MPAA, where a joint account was established solely by the funds of one of the two owners' of the account, a creditor of the other owner had no right of execution against the account, as the non-contributing owner had no right of ownership in the account funds until the death of the contributing owner. The analysis of the orphans' court, which focused upon whether there was evidence of an *inter vivos* gift, was clearly contrary to the provisions of the MPAA and the holding in *Deutsch*.

As the Superior Court and orphans' court each followed erroneous paths in their search for clear and convincing evidence of intent different from right of survivorship, we now examine whether the parties have raised any different, relevant arguments affecting this issue. Distilled to its essence, and setting aside those arguments that we have already directly rejected, Appellee's *pro se* brief contends that clear and convincing evidence of intent different from right of survivorship rests on (1) Appellant's purported failure to show Decedent's "donative intent," which Appellee contends amounts to a "constructive fraud" perpetrated by Appellant;

22. The plurality also noted that joint accounts with a right of survivorship are sometimes known as "poor man's wills." *Deutsch, supra* at 142. That is, "joint accounts provide a simple and inexpensive method of passing funds in the account from a deceased joint owner to the surviving joint owner, avoiding the necessity of probate." *Id.* at 142–43.

(2) the fact that the Treasury Direct account was created "in secret," without family witnesses or an attorney present; and (3) the contention that the record shows that Appellant exerted "undue influence" over Decedent. *See generally* Appellee's Brief at 13–44.

The problems with these arguments are many, not the least of which is that they are contradictory to relevant findings of fact and rest on the erroneous conclusion that Appellant had the burden to come forward with *additional evidence* to show that the Treasury Direct account, which on its face established a right of survivorship, reflected Decedent's intent that Appellant should own the remainder of the account upon Decedent's death. Certainly, had the evidence established that Appellant fraudulently had caused the joint account to be created or had "forged" Decedent's signature, as Appellee appears to suggest without directly stating,[23] then such "facts" would certainly serve to override the provisions of Section 6304(a) of the MPAA, as well as the clear expression of the account itself. However, the orphans' court made no such findings. The master determined that the Treasury Direct account was legitimately created, and the orphans' court not only left that finding undisturbed, but relied on the fact of the account's legitimacy when it determined that the account was created as a "convenience account" for Decedents' care during her lifetime. Further, there was no factual finding that Appellant exerted undue influence in the creation or titling of the account. In fact, the master found that Appellant had *not* exerted undue influence, a finding that the orphans' court, again, did not disturb.[24]

In order that financial institutions have the certainty and regularity required for the general course of human commerce, the General Assembly enacted the PEF Code, and,

23. *See* Appellee's Brief at 29.

24. With respect to Appellee's assertions that the Treasury Direct account was improperly created because it was done in "secret," it is axiomatic that the PEF Code does not require that wills or joint accounts be signed or created in public ceremonies for the satisfaction of potential beneficiaries.

relevant to the present case, the MPAA. Rather than allowing certain property to be subject to the protracted resolution of family disputes, as illustrated by the conflict between Appellant and Appellee,[25] the General Assembly established that joint accounts enjoy the presumption of a right of survivorship, absent "clear and convincing evidence" of a contrary intent. "Clear and convincing evidence" requires:

[that t]he witnesses must be found to be credible[;] that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order[;] and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In re Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 886 (1986) (quoting *LaRocca Trust*, 411 Pa. 633, 192 A.2d 409, 413 (1963); internal quotation marks omitted); *see also Lessner v. Rubinson*, 527 Pa. 393, 592 A.2d 678, 681 (1991).[26]

Here, because the account was titled in the names of Decedent "or" Appellant, the Treasury Direct account established a right of survivorship. Thus, more than a *presumption* of a right of survivorship existed; rather, based on its own terms and the explanation set forth in the Investor Kit, the account *proclaimed* a *conclusive* right of survivorship. Pursuant to Section 6304(a), it was *Appellee's* burden to come

**25.** Appellant and Appellee each presented evidence at the master's hearing setting forth their conflicting stories. Appellant gave the story of himself, the child of Decedent's favorite sister, and his wife, exerting efforts to care for Decedent when no other family members did so, in order to fulfill Decedent's wishes of remaining in her house with her pets rather than being placed in a care facility during her last years. By contrast, Appellee gave the story of Decedent as an aunt who loved all of her sisters and, according to the expressions set forth in her will, desired that they or their surviving children share equally in her substantial estate.

**26.** We note that the clear and convincing evidence standard is also required to prove a claim against a decedent's estate. *See Estate of Allen, supra* at 836.

forth with evidence "so clear, direct, weighty, and convincing" that the fact finder could, without hesitation, come to a clear conviction that Decedent, in fact, *had not intended* that there be a right of survivorship, despite the manner in which the account was held. Appellee's contentions of fraud and undue influence did not prevail below. Further, Appellee failed to present any evidence "so clear, direct, weighty, and convincing" that the fact-finder could come, without hesitation, to a clear conviction that a right of survivorship was not intended by Decedent.

We understand Appellee's disappointment, and we note the orphans' court and Superior Court's apparent discomfort with the master's conclusion that the proceeds of the Treasury Direct account, representing the bulk of Decedent's substantial property, belonged to Appellant rather than to the estate.[27] However, Decedent was wholly within her right to do with her property as she wished during her life, including placing the bulk of her property in a joint account with a right of survivorship. Absent a finding based on clear and convincing evidence that the account was fraudulently created, or accomplished through a breach of trust of the attorney-in-fact who had aided in the creation of the account, the lower courts were simply required to apply the MPAA to resolve the dispute. Because the lower courts erred in their interpretation of the MPAA and failed to properly apply its provisions, and because no clear and convincing evidence of an intent contrary to right of survivorship is evident in the record, we must reverse.

The order of the Superior Court is reversed, and this case is remanded to the orphans' court for treatment consistent with this opinion.

27. However, it is once again worth noting that had Decedent lived for many more years, the Treasury Direct account would presumably have become significantly depleted, leaving Appellant with far less pursuant to his right of survivorship, had he, in fact, survived her. To some extent, the existence of this lawsuit is grounded on the circumstance that Decedent happened to have died before she spent or gave away, as was her right, a substantial portion of her property.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices SAYLOR, EAKIN, BAER, and TODD join the opinion.