J-A07015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  ESTATE OF JEAN F. RICHARDS, DECEASED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  BARBARA A. MOZICK AND ANTHONY J. MOZICK | No. 1169 WDA 2014 |

Appeal from the Order June 25, 2014
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): 1507 of 2013

BEFORE:  BENDER, P.J.E., LAZARUS, J. and MUNDY, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED SEPTEMBER 01, 2015**

Barbara A. Mozick ("Barbara") and Anthony J. Mozick (collectively, "Mozicks"), husband and wife, appeal from the order entered in the Court of Common Pleas of Allegheny County, Orphans' Court Division, finding that Barbara had exercised undue influence over Jean F. Richards ("Decedent") and granting Barbara DeFrancesco's ("Daughter") appeal from probate. Upon careful review, we reverse and remand for proceedings consistent with the dictates of this memorandum.

The Orphans' Court set forth the facts of this case as follows:

[Decedent] died on February 21, 2013, while admitted at St. Clair Hospital for ongoing health problems.  Decedent's Last Will and Testament dated February 19, 2013, was admitted to probate on June 27, 2013.  On July 17, 2013, Barbara DeFrancesco, the only daughter of the [D]ecedent, filed a Petition for Citation Sur Appeal from the Register [of Wills] with this [c]ourt, challenging the probate of [D]ecedent's will.  In the petition[,] Ms. DeFrancesco alleged that at the time of execution of the Will the [D]ecedent lacked testamentary capacity, and that the Will was the result of undue influence exercised by Barbara Mozick, neighbor of the [D]ecedent.  This Court held a

hearing on the issues from March 27 to March 28, 2014. On June 25, 2014, the Court issued an Order finding that Barbara Mozick exerted undue influence over [D]ecedent; the Court did not, however, find that [D]ecedent lacked testamentary capacity at the time she executed her will.

Orphans' Court Opinion, 9/26/14, at 1 (unnumbered).

The Mozicks filed a timely notice of appeal and Pa.R.A.P. 1925(b) statement of errors complained of on appeal; they raise the following issues for our review:

> 1. Whether [Daughter] met her burden of proof of the exertion of undue influence upon the [D]ecedent[?]
>
> 2. Whether the [Mozicks] met their burden of proving the absence of undue influence[?]

Brief of Appellants, at 6.

Our scope and standard of review applied to an appeal from a decree of the Orphans' Court adjudicating an appeal from probate is as follows:

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to the appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion.

*In re Estate of Tyler*, 80 A.3d 797 (Pa. Super. 2013) (en banc) (citing *Estate of Reichel*, 400 A.2d 1268, 1269-70 (Pa. 1979)). An appellate court will set aside the Orphans' Court's factual conclusions only if they are not supported by adequate evidence. *In re Bosley*, 26 A.3d 1104, 1107 (Pa. Super. 2011). This Court exercises plenary review over the legal

- 2 -

conclusions drawn from the facts. *In re Mampe*, 932 A.2d 954, 959 (Pa. Super. 2007).

The applicable burden of proof in a case in which the contestant of a will asserts the existence of undue influence is as follows:

> The resolution of a question as to the existence of undue influence is inextricably linked to the assignment of the burden of proof. *In re Estate of Clark*, 334 A.2d 628, 632 (Pa. 1975). Once the proponent of the will in question establishes the proper execution of the will, a presumption of lack of undue influence arises; thereafter, the risk of non-persuasion and the burden of coming forward with evidence of undue influence shift to the contestant. *Id.* The contestant must then establish, by clear and convincing evidence, a *prima facie* showing of undue influence by demonstrating that: (1) the testator suffered from a weakened intellect; (2) the testator was in a confidential relationship with the proponent of the will; and (3) the proponent receives a substantial benefit from the will in question. *Id*. Once the contestant has established each prong of this tripartite test, the burden shifts again to the proponent to produce clear and convincing evidence which affirmatively demonstrates the absence of undue influence. *Id.*

*In re Estate of Smaling*, 80 A.3d 485, 493 (Pa. Super. 2013) (en banc) (footnote omitted). "As our Supreme Court has held, a testator may be of sufficient testamentary capacity to make a will but still may be subjected to the undue influence of another in the making of that will." *Mampe*, 932 A.2d at 959, citing *In re Estate of Fritts*, 906 A.2d 601, 606-07 (Pa. Super. 2006) (other citations omitted).

This Court in *Fritts* set forth the definition of undue influence as follows:

> [U]ndue influence is a subtle, intangible and illusive thing, generally accomplished by a gradual, progressive inculcation of a receptive mind. Consequently, its manifestation may not appear until long after the weakened intellect has been played upon.
>
> **Owens [v. Mazzei**, 847 A.2d 700,] 706 [(Pa. Super. 2004)] (quoting **In re Estate of Clark**, 461 Pa. 52, 334 A.2d 628, 634 (Pa. 1975)) (internal quotations and citation omitted). Our Court has stated:
>
> > Conduct constituting influence **must** consist of "imprisonment of the body or mind, or fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will."
>
> [**In re Estate of] Luongo**, 823 A.2d 942,] 964 [(Pa. Super. 2003)] (quoting [**In re Estate of] Angle**, 777 A.2d 114,] 123 [(Pa. Super. 2001)] (emphasis in original).

**Fritts**, 906 A.2d at 607.

"Although our cases have not established a bright-line test by which weakened intellect can be identified to a legal certainty, they have recognized that it is typically accompanied by persistent confusion, forgetfulness and disorientation." **Smaling**, 80 A.3d at 498, quoting **Fritts**, 906 A.2d at 607.

> A confidential relationship exists
>
> when the circumstances make it certain that the parties did not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed. A confidential

- 4 -

relationship is created between two persons when it is established that one occupies a superior position over the other — intellectually, physically, governmentally, or morally — with the opportunity to use that superiority to the other's disadvantage. [S]uch a relationship is not confined to a particular association of parties, but exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest.

*Id.* at 498 (omitting quotation marks and citations).

Each prong of the undue influence test must be established by clear and convincing evidence, which requires:

that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010) (brackets omitted).

Here, the Mozicks argue that Daughter did not prove a *prima facie* case of undue influence. In the alternative, they argue that, even if Daughter did establish a prima facie case, they successfully proved the absence of undue influence by clear and convincing evidence. Upon our review of the record, we conclude that the Orphans' Court erred in finding that Daughter presented *prima facie* evidence of undue influence. Specifically, Daughter failed to establish that the "confidential relationship"

prong of the tripartite **Clark** test was proven by the requisite quantum of evidence.

In the portion of its opinion addressing the confidential relationship prong of the **Clark** test, the Orphans' Court emphasizes the fact that the Decedent named Barbara as her agent under a power of attorney. However, while the granting of a power of attorney is one indicia of a confidential relationship, that fact alone is not dispositive. **See In re Estate of Ziel**, 359 A.2d 728, 733 (Pa. 1976) (power of attorney not dispositive where agent became principal's attorney-in-fact at principal's instance and merely for his convenience). Similar to **Ziel**, the unrefuted testimony at trial demonstrated that the Decedent requested that Barbara accompany her to PNC Bank to execute a power of attorney with respect to her bank accounts. Significantly, and as the Orphans' Court acknowledged, Barbara never exercised her authority under that power of attorney.

The Orphans' Court also emphasizes the frequency with which Barbara visited Decedent while she was hospitalized, and the fact that "doctors recognized her as the person to whom they should communicate regarding [D]ecedent's condition and care." Orphans' Court Opinion, 9/26/14, at 4. However, the contestant presented no proof whatsoever that Barbara ever exercised an "overmastering influence" on her friend, **see Smaling**, **supra**, or otherwise destroyed her free agency in an attempt to convince the Decedent to make of a will in her favor.

Barbara and the Decedent had been friends for nearly fifty years. By her own admission, Daughter lacked access to a consistent means of transportation and would have been unable to visit and advocate for her mother on a regular basis. Accordingly, the widowed Decedent naturally turned to Barbara, her close friend and neighbor, for necessary support. The existence of a close friendship, in which one party provides care and assistance to the other in a time of need, does not, without more, provide the proof necessary to conclude that the assistance was given with nefarious intent.

Finally, the Orphans' Court buttressed its conclusion with the statement that "[Barbara] procured the attorney who drafted [D]ecedent's February 19th will." Orphans' Court Opinion, 9/26/14, at 4. However, the evidence adduced at trial does not support this finding. Leonard Weaver, a friend and neighbor of the Decedent who met with her alone in her hospital room, testified that the Decedent made two requests of him during his visit. First, she asked that he file her income tax return and instructed him where in her home to find the necessary materials. Second, Weaver testified that the Decedent was aware that she did not have long to live and asked for his assistance in obtaining a lawyer to draft a new will. Weaver testified that it was he, and not Barbara, who contacted Leonard Costa, Esquire, who had drafted Weaver's own will. Weaver further testified that, during his conversation with Attorney Costa, Weaver himself suggested that the

Mozicks should be the ones to coordinate Attorney Costa's visit to the Decedent, as they visited her every day. Attorney Costa also testified that Weaver called him and advised him that the Mozicks would be contacting him. There is nothing more in the record upon which the court could have based a finding that Mozick "procured" Attorney Costa to draft the Decedent's will.[1]

We also note that the Orphans' Court cites to our Supreme Court's decision in **Clark Estate**, **supra**, for the proposition that "in a will contest, the assessment of secrecy of the relationships, not unlike the evaluation of credibility of the witnesses, must be a factor which is properly within the sole discretion of the trier of fact." **Id.** at 635. However, the facts of **Clark** are readily distinguishable from the facts of the case at bar, such that the language cited by the court – devoid of factual context – is inapt.

In **Clark**, the testatrix was an elderly widow suffering from dementia caused by arteriosclerosis who left the bulk of her estate to a cousin, John Smith. Smith had befriended the testatrix during the last few years of her life, and assumed many of her business duties. During the last months of

_____

[1] Moreover, the two disinterested witnesses who testified at trial – the scrivener, Attorney Costa and Leonard Weaver – both testified that the Decedent was alert during their visits and was specific and precise in conveying her desires and instructions. Weaver and Attorney Costa both testified that Decedent was emphatic that she did not want to include her daughter as a beneficiary under her will.

the testatrix's life, Smith kept all of testatrix's stock certificates, bonds, and deeds in his home. Smith also

> wrote [testatrix's] will by hand as it was dictated to him by [testatrix]. He then procured a typewriter and paper and delivered them with the handwriting to a Mrs. Curtis, whom [Smith] paid to type the will. John Smith picked up the finished product on November 13, 1971, took it to [testatrix] and watched her sign it. He then obtained the signatures of [two] witnesses. Neither saw [testatrix] sign the will, and neither knew that it was a will she was witnessing. Both [witnesses], however, recognized the signature of [testatrix] and both spoke with [her] on November 13 and found her in good spirits and mentally normal. John Smith took the will and all copies to his home where they remained until after [testatrix's] death.

*Id.* at 634-35.

A nephew of the testatrix, her only other relative, challenged the will on the basis that Smith had exerted undue influence upon the testatrix. In affirming the Orphans' Court's finding of undue influence, the Court noted that

> [t]he [testatrix] and John Smith were alone when the will was executed. The hearing judge had only John Smith's testimony as to what the decedent expressed as her testamentary intent and as to what her condition of mind was. These parties were alone again when the decedent transferred her securities to him and when she made a gift of $ 21,500 to him.

*Id.* at 635. Thus, it was in the context of these facts that the Court noted the trial court's discretion to "assess[] . . . the secrecy of relationships." *Id.*

Here, however, there was no secrecy surrounding the execution of Decedent's will. Decedent expressed her testamentary wishes not only to Attorney Costa, the scrivener, but also to Leonard Weaver. Moreover,

neither of the Mozicks were present when Attorney Costa met with the Decedent to draft her will.

In sum, the evidence presented by Daughter did not prove, by a clear and convincing standard, that Barbara imprisoned the Decedent's body or mind, or engaged in fraud, threats, misrepresentations, circumvention, inordinate flattery, or physical or moral coercion, such that Decedent's mind was prejudiced and her free will destroyed. *See Fritts*, *supra*.

For the foregoing reasons, we conclude that the Orphans' Court erred in finding that Barbara and the Decedent shared a confidential relationship and that a *prima facie* case of undue influence was proven.[2]

_____

[2] We also have strong doubts about the Orphans' Court's determination that the Decedent suffered from a weakened intellect. Daughter presented the deposition testimony of Dr. James Nicotero, who never met or examined the decedent. Dr. Nicotero testified that Decedent would not have possessed testamentary capacity and that she suffered from a weakened intellect. However, the court completely disregarded Dr. Nicotero's testimony regarding Decedent's lack of testamentary capacity, and found that the Decedent was, in fact, competent to execute a valid will. Nevertheless, the court accepted Dr. Nicotero's opinion that Decedent suffered from a weakened intellect. These conclusions, based on the identical medical evidence, are difficult to reconcile, especially in light of the other testimony elicited at trial. Indeed, no other witness testified that Decedent exhibited persistent confusion, hallucinations or any of the other indicia that Dr. Nicotero testified would have been present given her blood-oxygen levels.

Nevertheless, the Orphans' Court's finding of weakened intellect is supported by evidence of record, in the form of Dr. Nicotero's deposition testimony. Accordingly, we are constrained to defer to the Orphans' Court's conclusion that the "weakened intellect" prong of the *Clark* test was proven by sufficient evidence.

Order reversed. Case remanded for proceedings consistent with the dictates of this memorandum. Jurisdiction relinquished.

MUNDY, J., Joins the majority.

BENDER, PJE., Files a Dissenting Memorandum.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/1/2015