J-S19031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.K., MOTHER | : | No. 3339 EDA 2019 |

Appeal from the Order Entered October 24, 2019
in the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000475-2019

BEFORE: BOWES, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:               Filed: July 16, 2020

M.K. ("Mother") appeals from the Order finding that the injuries to her child, L.S. ("Child"), a male born in June 2008, were the result of child abuse pursuant to 23 Pa.C.S.A. § 6303(b.1) by Mother; discharging the dependency of Child; and terminating the Philadelphia Department of Human Services' ("DHS") supervision of Child and his family.[1, 2] We affirm.

In its Opinion, the trial court ably and accurately set forth the factual background and procedural history of this appeal as follows:

> DHS became involved with this family on December 7, 2018, when DHS received a Child Protective Services ("CPS") report alleging that Child became upset and began hysterically crying

---

[1] Child's father, L.S., Sr., ("Father") is not participating in this appeal, nor has he filed a separate appeal on his own behalf.

[2] Notably, Mother does not challenge the portion of the Order that terminated DHS supervision of the family.

after stating that his life had been ruined after receiving Saturday detention at school; Child stated that he was hit with a wire; Child had cuts on his arms; and Child indicated that the last incident occurred approximately one week prior to the report. This report was indicated.

On December 8, 2018, DHS interviewed Child, Mother, and Child's siblings.[3] DHS informed Mother of the allegation and Mother admitted to physically disciplining Child. Mother stated that Child was misbehaving in school and being disobedient at home; Mother frequently received calls from Child's school regarding his behavior; Child had been suspended from school; Mother's usual methods of discipline consisted of making the children write essays, using time-out, and taking things away; Mother hit Child with a belt approximately three weeks prior and that in her homeland, it was acceptable for parents to physically discipline their children; and Father did not live in the home, but was there sporadically. DHS subsequently interviewed Child and [Sibling 1] with Mother's permission. Child denied that he told anyone that he had been hit with a wire hanger. Child showed DHS the marks on his upper left arm and indicated that the marks were old and that they had been there for a long time; he could not recall how he got the marks or if they hurt at the time of the injury; he could not remember if he got the marks at home or at school; and the marks did not currently hurt him. DHS observed the marks to be old and healed. Child also stated that he was not fearful of his home environment and that he felt safe in the home. Sibling 1 indicated that he did not know of Child being hit with a wire hanger by Mother; Mother's usual discipline including making the children write essays, stand in the corner, or be sent to their room. Sibling 1 indicated that he was also not fearful of the home environment and that he felt safe in the home. DHS observed [Sibling 2 and Sibling 3] playing in the living room of the home. These two children appeared safe and appropriately cared for[,] and did not appear to be fearful of the home environment.

---

[3] Child has three siblings (collectively, the "Siblings"): I.S. ("Sibling 1"), a male who was twelve years old at the time of the hearing; A.S. ("Sibling 2"), a female who was seven years old; and K.S. ("Sibling 3"), a female who was two years old. In the October 24, 2019 Order, court supervision was terminated for all Siblings, including Child. Trial Court Opinion, 1/2/20, at 1. Child's siblings are not subjects of the instant matter.

On December 10, 2018, Mother took Child to the Children's Hospital of Philadelphia ("CHOP") Emergency Department ("ED") for evaluation of Child's injuries. Mother explained to the CHOP staff that Child's injury was the result of playing with his older sibling with a coat hanger. CHOP determined that this explanation at the time of the examination was plausible[,] and Child was sent home with no further instruction.

On December 29, 2018, DHS visited Child and Sibling 2. DHS observed new injuries on Child's arm and Child stated that he was injured while "play fighting" with Sibling 1; the injuries occurred approximately one week prior; he had gotten in trouble at school; Mother disciplined him by making him rewrite a Harry Potter book. Child denied being hit by Mother and indicated that he felt safe in the home. Child also indicated that Father came to the family home approximately twice per week and did not live in the home. Sibling 2 stated that Child was hit with a wire because he had gotten in trouble at school and she could not remember who had hit Child with the wire.

On January 22, 2019, DHS spoke with Sibling 1, who stated that he felt safe in the home; Child had gotten in trouble at school and Mother made Child rewrite a Harry Potter book. DHS did not observe any injuries on Sibling 1. Sibling 1 denied allegations of physical abuse and [Mother stated to DHS and testified] that Father did not live in the home. Mother stated that she believes Child got his injuries from "play fighting" at school.

On January 24, 2019, Mother took Child to CHOP for a second opinion about his injuries. The CHOP Buerger Center for Advanced Pediatric Care ("BCC") determined that Child had multiple healed patterned injuries to his upper left extremity and back, which were consistent with non-accidental trauma/physical abuse; Child had no history that would constitute a plausible explanation to support the injuries noted; the patterned scars were not consistent with injuries sustained in the process of normal play; and the cause of the findings for Child were most consistent with being repetitively hit with an object. CHOP BCC recommended that all four children undergo a forensic interview[,] and that Siblings should be evaluated by their pediatrician or at a hospital ED to determine if any injuries were present.

On January 29, 2019, DHS attempted to contact Mother, but was unsuccessful. Mother became noncompliant and refused DHS access to the family home. Mother also refused any future direct contact with DHS, and informed DHS that she had retained Counsel. On February 5, 2019, DHS visited Child, Sibling 1, and Sibling 2 at their school. The children reported that they felt safe in the home and denied any allegations of abuse. On February 28, 2019, DHS visited Sibling 3 at her daycare. DHS was unable to interview Sibling 3, due to her age, but there were no marks or bruises observed on Sibling 3. On March 5, 2019, DHS mailed a letter to Mother and Counsel. On March 13, 2019, DHS spoke with Counsel via telephone. Counsel stated that he was in the process of filing an appeal regarding the indicated CPS report and refused further communication with DHS. On March 21, 2019, DHS filed a dependency [P]etition for Child.

On April 3, 2019, the trial court adjudicated Child dependent with DHS supervision in the family home. Mother was present for this hearing. The trial court ordered Child be referred to the Philadelphia Children's Alliance ("PCA") for an interview and to Behavioral Health Services ("BHS") for a consultation and/or evaluation. The trial court referred Mother to the Achieving Reunification Center ("ARC") for parenting. Mother was ordered to allow the Community Umbrella Agency ("CUA") to perform a home assessment.

On April 26, 2019, Child completed a psychological evaluation with Mother present at the evaluation. The psychologist diagnosed Child with unspecified disruptive impulse control and conduct disorder[,] and recommended that Child receive 10 hours of behavior consultation services in the school over a 60[-]day period in order to determine what future services may be beneficial; Child should enroll in a social/athletic program where he can interact with peers; and Mother should make a formal request in writing for an education evaluation for Child.

On June 12, 2019, a permanency review hearing was held for Child. Mother was present for this hearing. The trial court determined that Mother was fully compliant with the permanency plan. The trial court ordered DHS supervision to stand.

On July 3, 2019, a permanency review hearing was held for Child. Mother was present for this hearing. The trial court ordered DHS supervision to stand and that all discovery, as well as a list

of witnesses, be passed to all parties by August 1, 2019, for the upcoming child abuse hearing.

On October 24, 2019, a permanency review and child abuse hearing was held for Child. Mother was present for this hearing.[4] The trial court found child abuse against Mother and the CY48 ["indicated" report] to be founded and turned [the CY48 report] into a CY49 [founded report]. Additionally, the trial court determined that there were no safety or dependency concerns in Mother's home. The trial court discharged DHS supervision and the dependency [P]etition.

Trial Court Opinion, 1/2/20, at 1-4 (footnotes added; citations and footnotes omitted).

On November 25, 2019, Mother timely filed a Notice of Appeal, along with a Concise Statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(ii) and (b).

On appeal, Mother raises the following issue: "[] Did the [t]rial [c]ourt err and abuse its discretion by making a finding of abuse that was not supported by clear and convincing evidence[?]" Mother's Brief at 7.

Mother argues the trial court's finding of abuse was not supported by clear and convincing evidence. *Id.* at 12. Mother contends that DHS's

_____

[4] Mother, Mother's counsel, and Father's counsel were present at the hearing. Child was represented by Elizabeth Flanagan, Esquire as his child advocate. DHS presented the testimony of Brian Brennan, M.D. ("Physician"), the DHS case manager assigned to the family, and a DHS intake supervisor. Mother testified on her own behalf. The trial court accepted Physician, a doctor with CHOP, as an expert in pediatric child abuse. Though the parties did not stipulate to Physician's expertise at the start of the hearing, there were no objections to the trial court's acceptance of Physician as an expert on pediatric child abuse. N.T., 10/24/19, at 10; Trial Court Opinion, 1/2/20, at 6, n.4.

assertion that Mother beat Child is based solely on the hearsay testimony of Sibling 2. *Id.* Mother also complains that Physician, DHS's expert witness, evaluated Child to render a second opinion more than one month after Child sustained the injury. *Id.* at 12-13.

Our standard of review in dependency cases is well established.

> The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify the fact-finding of the [trial] court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re R.R.*, 686 A.2d 1316, 1317 (Pa. Super. 1996) (citations omitted).

We have stated that the Child Protective Services Law ("CPSL") "controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." *In re L.V.*, 209 A.3d 399, 417 (Pa. Super. 2019) (citations omitted). "Clear and convincing evidence" requires

> that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted[,] provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

*In the Interest of J.M.*, 166 A.3d 408, 423 (Pa. Super. 2017) (citing *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010) (citations and internal brackets omitted)).

Section 6303 of the CPSL defines "child abuse" as follows, in relevant part:

**§ 6303. Definitions.**

\* \* \*

**(b.1)** *Child abuse.* — The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

(1) Causing bodily injury to a child through any recent act or failure to act.

\* \* \*

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

23 Pa.C.S.A. § 6303(b.1)(1), (5). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(a).

Our Supreme Court has stated that the identity of the perpetrator of child abuse "need only be established through *prima facie* evidence in certain situations…." *In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *Id.* at 1184 (citation omitted).

Section 6381(d) of the CPSL provides, in part, the following:

Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d). The *L.Z.* Court held:

[E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption. The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the [children and youth services] agency and the rebuttal of the parent or responsible person.

*In re L.Z.*, 111 A.3d at 1185 (footnote omitted).

Mother does not dispute that Child sustained injuries and was in her sole custody during the relevant time period in this case; rather, she disputes the trial court's determination that Child's injuries were caused by non-accidental trauma. Mother's Brief at 12. She contends that Child's injuries could have occurred during normal care as a result of Child playing with his older brother, as was initially accepted as the explanation when Child was examined at CHOP. *Id.*

In its Opinion, the trial court addressed Mother's issue as follows:

Mother alleges that the trial court erred in finding child abuse by clear and convincing evidence. Child first became known

- 8 -

to DHS after Child disclosed to a school employee that his life was "ruined" because he received detention in school and that he was beat with a wire by his parents.

As part of DHS's investigation, Mother was interviewed regarding Child's allegations. Mother indicated that she could not recall how Child's injuries occurred, but later indicated that it could have happened at school, it could have happened because Child and his older sibling "fight" all of the time, and that it could have happened during the course of play. Mother indicated that Father was not residing in the home at the time of the investigation[,] and there were no other caregivers living in the home. During the investigation, the DHS social worker observed men's clothing and shoes in the home, although Mother claimed the clothes were in the home because she sends donated clothes to Africa. Mother denied the use of any physical abuse and explained that her method of discipline for the children in the home was to re-write books and words from the dictionary. Mother denied using this form of punishment with the children.

The DHS social worker ultimately determined that Mother's explanation was not credible after Mother provided multiple explanations for the cause of Child's injuries. The DHS social worker recommended that Child be taken to the hospital to be examined, [and] Mother complied. The DHS social worker also spoke with Child alone in the dining room while Mother was in the living room, and Child indicated his scars were from "playing swords with hangers." The DHS social worker also observed multiple loop marks on his arm. Child appeared calm while speaking with the DHS social worker, but would look over to Mother at times when he seemed unsure of how to respond. The DHS social worker attempted to complete the interview without Mother present, but Mother attempted to hover. The DHS social worker determined that Child's story did not seem plausible, based on the looped shape of Child's injuries.

The DHS social worker later spoke with Sibling 1, who did not have any apparent injuries, and provided the same story as Child. Sibling 1 also appeared slightly nervous during the interview[,] and would look towards Mother. The DHS social worker did not find Sibling 1's story to be plausible for the same reason that Child's story was not plausible. The DHS social worker also interviewed Sibling 2. No injuries were observed on Sibling 2[,] and she indicated that she was aware of Child's injury. Sibling

2 indicated that their parents did hit Child with a wire, but failed to go into more detail. The DHS social worker also reviewed Child and [S]iblings' medical records from the[ir] primary care physician, which indicated that scars were observed on the children in the past.

It was established from the testimony of [Physician] that Physician was contacted to consult on Child's matter at CHOP after Child [] was brought into the [ED] with injuries to his arm. The initial story provided to hospital staff was that Child was injured after Sibling 1 hit him with a coat hanger. However, Sibling 2 later disclosed to the [ED] that Child was hit with a wire. When Physician later spoke with Child about the cause of the injuries to his arm, Child did not disclose any abuse and indicated that Sibling 1 hit him with a coat hanger when they were playing. Physician did not speak with Mother about the cause of Child's injuries. Physician indicated that in matters where a forensic interview will be conducted, the physician will not typically interview the child involved to preserve the truth of the story, since in some cases, when children are asked the same question multiple times, children will change their answer in fear of answering the question "wrong."

During Physician's consultation with Child, Physician observed a linear scar at the top of Child's arm, a curvilinear scar below the linear scar, and a hyperpigmented mark with some scarring below the curvilinear scar. Physician also observed that Child had a looped pattern mark on his back. Physician noted that when Child scars, he develops keloids, which is a genetic predisposition for heavy, robust scarring. Since Child develops keloids, the thickness of the scarring does not indicate the level of force used to cause the injuries. Based on Physician's observation of Child's injuries to his arm, Physician determined that Child's injuries did not match the description given at the [ED]. The two lower scars on Child's arm are curved, which is typically caused by a linear type of flexible cord, wire, rope, or belt. The item is typically something that has been looped over itself and then held in the hand and use[d] to hit the other person. This type of injury is not caused by an item that is more rigid, like a coat hanger or a ruler. Even if the coat hanger were molded into a sword-shape, this would not change Physician's conclusion regarding the item used because the scarring indicates that the object used was significantly more flexible. The type of injury that Child experienced can cause bleeding, since the scarring indicated that

the skin had been opened at both the top and lower layer of the skin. This injury would cause substantial pain to anyone that experienced it, including Child.

At the time of Physician's consultation with Child, Child noted that he was not in any pain. Physician was unable to determine the timeframe of the injury, except that it wasn't immediately recent, since the injury had time to heal and scar. Physician also noted that the scarring that Child experienced will likely be permanent, even though it may fade slightly over time. Physician concluded that Child's injuries were intentionally inflicted[,] and are not consistent in the process of normal play, although he cannot determine the intent behind the injury. Child's injuries are consistent with being hit repetitively with an object[,] and child abuse. Physician's conclusion regarding Child were also made by the attending physician working alongside of Physician. Physician indicated that[,] although there is a finding of child abuse, Physician does not know who inflicted the injury. Physician was able to rule out any other medical conditions as the cause of Child's injuries.

Mother claims that she has never hit any of her children. Mother indicated that when any of the children are misbehaving, she will take things away from the children. Based on DHS's investigation, DHS indicated the CPS report[,] based on Sibling 2's testimony and the report from Physician and his team. Based on the exhibits and testimony on October 24, 2019, the trial court found clear and convincing evidence that Child's injuries were the result of child abuse under 23 Pa.C.S.A. §[ ]6303(b.1). Furthermore, there was *prima facie* evidence that Mother is the perpetrator of child abuse under 23 Pa.C.S.A. §[ ]6381(d)[,] since Mother was the primary caregiver for Child[,] and the only caregiver that resides in the home. Mother was unable to rebut the presumption. The DHS witnesses were credible. Consequently, the trial court did not err or abuse its discretion in finding child abuse.

Trial Court Opinion, 12/2/19, at 5-8 (some paragraph breaks added, some citations and footnote omitted).

Based its findings, which are supported by competent evidence in the record, the trial court reasonably rejected Mother's contentions regarding

- 11 -

Sibling 2's explanation being inadmissible hearsay, and Physician's expert examination of Child and his scarring coming too late in any investigation to have credibility. The trial court did not abuse its discretion in finding clear and convincing evidence to conclude that Child, who was previously adjudicated dependent pursuant to 42 Pa.C.S.A. § 6302, was not injured accidentally through play with his older sibling, but rather was the victim of child abuse by Mother, as defined by 23 Pa.C.S.A. § 6303(b.1). Accordingly, we affirm the Order finding Child was the victim of child abuse by Mother, discharging the dependency of Child, and terminating the supervision of the family by DHS.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/16/20