J-A18022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE MATTER OF THE ESTATE OF ERIC S. WAITE | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: LISA D. WAITE | : : : : : : : : | No. 157 WDA 2019 |

Appeal from the Order Entered January 11, 2019
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  O.C. 68-2018

BEFORE: BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: JULY 13, 2021**

Appellant Lisa D. Waite appeals from the order[1] directing her to restore the decedent's credit union accounts to the estate of Eric S. Waite (the decedent).  Appellant argues that she owned all funds in the accounts when the decedent died and that the accounts did not pass into the decedent's estate.  Appellant also claims the trial court erred when finding that she violated her duties under a power of attorney (POA).  We affirm in part and reverse in part.

By way of a brief background, the record indicates that the decedent was married and lived on a working farm with his wife, Ladonna.  The decedent

---

[1] A party may appeal as of right from the order of the Orphan's Court Division that determines in interest in real or personal property.  **See** Pa.R.A.P. 342(a)(6).

and his wife had one daughter, Whitney Louise Basinger (Whitney),[2] and two sons, Jesse Waite (Jesse) and James Waite (James). James married Appellant in the early 1980s, and they had two children, Colin and Michael.

The trial court summarized its factual findings as follows:

1. In 1987, Appellant called [the decedent] to ask for help after she and James had a domestic dispute that left her with bruises. [The decedent] picked her up and took her to his home for an undisclosed period of time, after which she returned to James.

2. After that, [the decedent's wife] refused to have any further contact with either James or [Appellant], which meant they were not welcome to call or visit the Waite farm.

3. Unlike his wife, [the decedent] continued to talk with [James and Appellant] after the abuse incident, but only when he saw them on the street or in a store.

4. [The decedent] reached out to James after [the decedent's] wife died in April of 2006. James then began to visit regularly and help [the decedent] on the farm. [Appellant] visited, as well, though far less frequently. That arrangement continued uninterrupted until mid-2012.

5. [The decedent] suffered a series of mini-strokes in the summer of 2012, and in July of that year, he moved in with Whitney for approximately nine months.

6. On July 19, 2012, [the decedent] executed a durable POA naming Whitney as his agent and a last will and testament leaving $1.00 each to his son Jesse and grandsons, $1,000.00 each to James and [Appellant], and the residue and remainder of his estate to Whitney. He also named Whitney as the designated beneficiary on his checking and savings accounts.

_____

[2] The parties referred to decedent's daughter as either Whitney or Louise. We refer to the decedent's daughter as Whitney for the purpose of this appeal.

7.    Whitney had no cause to exercise her authority as POA, and in April of 2013, [the decedent] regained his health and was able to return to the farm. James and [Appellant] resumed contact at that point.

8.    [The decedent] was still living at the farm when he decided to change his will, and upon his request, [Appellant] drove him to Attorney George Kulakowski's office and witnessed his signature on January 6, 2014. They did not discuss its terms, and [Appellant] was unaware of the prior will. [The January 6, 2014 will left $1.00 each to the decedent's son Jesse and the decedent's grandsons. The January 6, 2014 will also directed that the residue of the estate be divided evenly among James, Appellant, and Whitney. The decedent named Attorney Kulakowski as executor.]

9.    Having directed that his estate be distributed in equal shares to James, [Appellant], and Whitney, [the decedent] took possession of his new will and secured it with various other documents at his home. [Appellant] and James became aware of [the January 6, 2014 will] a few weeks later.

10.   James testified . . . that [the decedent] was competent when he executed [the January 6, 2014] will and that it reflected his wishes.

*    *    *

12.   A few weeks after executing [the January 6, 2014 will, the decedent] was admitted to the hospital. He was suffering from acute delirium occasioned by severe dehydration.

13.   The delirium associated with dehydration disappears within hours to days of treatment, and there was no credible evidence that [the decedent] did not recover his mental faculties accordingly. For undisclosed reasons, however, a hospital social worker advised James and [Appellant] that he could no longer live by himself. He thus moved in with [James and Appellant] while they searched for an appropriate long-term care facility.

14.   [The decedent] was actively involved in choosing his placement. He first made it clear that he did not want to reside at Mulberry Square, as it carried unpleasant memories with his deceased wife's stay, or give his money to the doctor that owned Mahoning Riverside Manor. He

- 3 -

then approved the AM/PM Personal Care Home [(AM/PM)] after accompanying James and [Appellant] to inspect the facility.

15. During his stay with James and [Appellant], [the decedent] experienced episodes of incontinence and issues with his mobility. Whereas James's testimony regarding [the decedent's] dementia-like episodes was not independently credible and there was no corroborating evidence of compromised cognition, however, the [c]ourt does not find that [the decedent] also exhibited signs of cognitive dysfunction during that timeframe.

16. Evidence of [the decedent's] continuing capacity includes his ability to actively participate in selecting his permanent residence and to accurately advise [Appellant] as to the identity and whereabouts of the documents he wanted her to retrieve from his house.

17. [On February 14, 2014, the decedent signed a POA naming Appellant as his agent]. An independent and disinterested party, Attorney Jeffrey Lundy's actions confirmed [the decedent's] capacity during the relevant time period. An experienced estate attorney who had prepared hundreds of POAs, he spoke with the decedent at some length before preparing [a] POA naming [Appellant] as his agent, and one of his goals was to ascertain the [decedent's] capacity to execute such a document. To that end, he established, among other things, that [the decedent] was fully aware of the nature and extent of his property.[fn1]

   [fn1] Attorney [Jeffrey] Lundy did not actually recall his interactions with [the decedent]. He testified about his general practice with respect to preparing POAs, however, and the [c]ourt may reasonably assume that he followed the same procedures before allowing [the decedent] to sign the POA in question.

18. In addition to securing [the decedent]'s signature, Attorney Lundy had [Appellant] sign the POA to acknowledge her understanding and acceptance of its requirements, including the specific requirements that she exercise her powers for [the decedent's] benefit; that she keep her assets separate from his; and that she keep a full and accurate record of her actions and transactions as made on his behalf.

19.    Before leaving Attorney [Jeffrey] Lundy's office that day, [the decedent] accepted the bill for the POA, retrieved a check from his shirt pocket, and wrote it out to the appropriate recipient and in the appropriate amount. He did so without assistance.

20.    At [the decedent's] direction, [Appellant] next took him to Priority First Federal Credit Union, where he asked the teller to remove Whitney and add [Appellant] as the POA and designated beneficiary of his checking and savings accounts. [Appellant] did not join the discussion until after the account change card was completed.

21.    As [Appellant] from was driving home from the credit union, [the decedent] explained that she, as his designated beneficiary, would automatically become sole owner of [the credit union] accounts after he died.

22.    [Appellant] told James that same day about what transpired at Attorney [Jeffrey] Lundy's office and that [the decedent] had changed the POA designation on [the credit union] accounts. That came to no surprise to James, who had been part of the conversation in which it was decided that [Appellant] was the most feasible choice to be [the decedent's] POA. Because [Appellant] did not tell him, however, James did not have the opportunity to react to [the decedent's] decision to make her his designated beneficiary.

*    *    *

25.    On February 21, 2014, after living with James and [Appellant] for approximately two weeks, [the decedent] became a resident at AM/PM.

*    *    *

29.    With no expectation of returning home, [the decedent] agreed to sell the farm at auction and gave [Appellant] the names of a few auctioneers she could contact. [The farm and the equipment was sold in October of 2014.] The final result was a check from Amy Morris in the amount of $147,082.28 for the real estate and a check from Timothy Powell in the amount of $16,500.00 for the equipment. At [the decedent']s direction, [Appellant] deposited both into his savings account. [On November 19, 2014, the decedent

executed a codicil to the will. With James's blessing, the decedent made Appellant his executor rather than Attorney Kulakowski].

30. As [the decedent's] POA, [Appellant] assumed responsibility for paying his bills after he moved into [AM/PM]. That included [writing] multiple checks to The Serene Law Firm for services performed on behalf of [the decedent]. Prior to that time, [the decedent] had been issuing most of his own checks.[]

31. [The decedent] continued to keep track of his financial affairs even after [Appellant] took over, directing her to bring his financial statement to AM/PM each month so he could review them and giving her specific instructions at times on how to manage his [credit union] accounts. Concluding that his checking account was growing too large, for instance, he asked her in October of 2015 to transfer $30,000 to savings.

32. Because [the decedent]'s insurance paid for all but incidental expenses at AM/PM and the skilled nursing facility to which he was transferred in 2015, [the decedent]'s checking account continued to grow each month by the amount of his pension and other smaller deposits. . . .

Op. on Pet. & Objs., 1/11/19, at 1-5 (record citations and some footnotes omitted).

In 2016, James and Appellant separated. They divorced in October of 2016. Appellant did not inform the decedent of the divorce. According to the trial court:

33. [Appellant] continued to be [the decedent]'s POA until he died. Her divorce from James in October of 2016 did not change that in the eyes of the law, and because no one told him about the change in their marital status, [the decedent] never had the opportunity to decide whether he wanted to remove [Appellant] as his POA or as a one-third beneficiary of his estate.

34. James did not object to [Appellant] continuing as [the decedent]'s POA after the divorce, as he believed she was

- 6 -

still doing a good job. In that regard, he knew [the decedent's] bills were being paid and that [Appellant] was making sure he had everything he needed.

35. After [the decedent] died[, the register of wills admitted the decedent's January 6, 2014 will and the November 19, 2014 codicil to probate and granted letters testamentary to Appellant on February 12, 2018. James] asked [Appellant] about [the decedent's] stocks and how much money he had. [Appellant] advised him to talk to [his divorce] lawyer, at which point he went to Attorney [Jay] Lundy[3] to make further inquiries. As a result, he learned for the first time in March of 2018 that [Appellant] was designated beneficiary of [the decedent's credit union] accounts and, as such, was claiming the entire corpus of both.

36. That revelation clarified in James's mind why [Appellant] had declined any portion of the marital estate when they divorced.

37. Had [James] known sooner that [Appellant] was [the decedent's] designated beneficiary and the attendant implications, James credibly testified, he would have challenged the POA sooner and made sure [the decedent's credit union] accounts would become part of the estate upon his death.

*Id.* at 5-6 (record citations and some footnotes omitted). By the time of his death, the decedent's credit union accounts had $57,749.02 in checking and $502,787.68 in savings.

On July 14, 2018, Whitney and James filed a petition for citation of appeal against probated will and rescission of actions taken under POA. They alleged, in part, that Appellant designated herself as the beneficiary of the

_____

[3] As noted above Attorney Jeffrey Lundy acted as counsel when the decedent signed the POA. Attorney Jay Lundy was counsel for James in the divorce proceeding.

credit union accounts, engaged in unfair dealing, exerted undue influence over the decedent, and violated her duties under the POA. Whitney and James's petition requested that the court rescind Appellant's designation as a beneficiary on the credit union accounts, force an accounting, and require Appellant to remit all funds from the accounts to the estate. Additionally, Whitney and James requested that Appellant be removed as executor of the decedent's estate.

On July 31, 2018, the trial court issued a preliminary decree awarding a citation and directing Appellant to show cause why Whitney and James's appeal from the probated will should not be sustained. On August 20, 2018, Appellant filed an answer and new matter.

On August 23, 2018, the trial court entered an order directing Appellant to provide an accounting within ten days. The order scheduled a hearing for December 20, 2018, to determine "whether or not [the decedent] was unduly influenced in signing both the [POA] and the bank card" designating Appellant as the beneficiary. Order, 8/23/18.

At the December 20, 2018 hearing, Whitney and James testified on behalf of their petition. They also called Connie Giroskey, a manager at AM/PM, and Appellant as of cross. Appellant testified on her own behalf and called Gregory Peace, a friend of the decedent, and David J. LaPorte, Ph.D., who was qualified as an expert in psychology.

On January 11, 2019, the trial court concluded that Whitney and James lacked standing to challenge Appellant's appointment as executor of the decedent's estate. The trial court also found that Appellant did not unduly influence the decedent when he signed the POA or when he designated Appellant as the beneficiary of the credit union accounts. The trial court further determined that although the decedent was diagnosed with dementia before entering AM/PM in February of 2014, "it was not until early 2017 that significant cognitive deficits were observed." Op. on Pet. & Objs. at 4.

However, the trial court concluded that Appellant "abused her power and authority as the decedent's [POA]." Order 1/11/19. The trial court directed Appellant to submit a full accounting regarding the credit union accounts from the date she became POA and "take whatever steps are necessary to restore the decedent's checking and savings accounts to [the decedent's] estate for distribution." *Id.*

In support of its decision to have Appellant restore the credit union accounts to the decedent's estate, the trial court reasoned:

> In large print covering less than one-quarter of a standard sheet of paper, the last page of the POA specifically referenced Chapter 56 of Title 20 and contained four specific affirmations that [Appellant] adopted as [the decedent's] agent. They included, "I shall exercise the powers for the benefit of the principal" and "I shall keep the assets of the principal separate from my assets." Those statements correspond with the duties enumerated in 20 Pa.C.S.[] § 5601.3(b)(1), which also obligated [Appellant] to "[a]ct so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest" and to "[a]ttempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is

actually in the principal's best interest based on all relevant factors." [20 Pa.C.S.] § 5601[.3](b)(2) & (6). By acquiescing to [the decedent's] decision to name her as his designated beneficiary, [Appellant] violated each of the duties.

Although the evidence does not indicate that [Appellant] was depositing her own income into [the decedent's] accounts or transferring any of his money into hers—excepting the compensation she was legitimately receiving for her POA services—her status as his designated beneficiary meant, in effect, that his money was her money. She certainly understood that; she grasped right away that every penny would become hers to utilize as she wished once [the decedent] passed, and she certainly should have comprehended that [the decedent's] decision thus effectuated a co-mingling of their assets.

What [Appellant] unquestionably knew, moreover, was that her being [the decedent's] designated beneficiary did not comport with the terms of the [the January 6, 2014] will he had executed just five weeks before. She had read that will only days before taking [the decedent] to the credit union and thus knew that he only planned to leave her a third of the assets and wanted to divide the other two-thirds between James and Whitney. Yet she chose to remain silent on February 14, 2014 and every day thereafter and, knowing that all the money would eventually be hers, was content to see the balance of [the decedent's] accounts increase month by month. Knowing the money would eventually be hers, moreover, she raised no objection when [the decedent] instructed her to deposit the proceeds from the farm and equipment sales into his savings account.

As the record reflects, the risk envisioned in [20 Pa.C.S. §5601.3(b)(2)] was also realized when [Appellant] failed to keep her assets separate from [the decedent's]. Confronted with the likelihood of becoming hundreds of thousands of dollars richer as [the decedent's] designated beneficiary, she made no attempt to caution him about how it would affect his estate plan. Evidencing a pernicious mindset, moreover, she kept the designation a secret even from Whitney and [James] her own husband—the only other people who would be affected and might force her to relinquish her claim to all of [the decedent's] liquid assets.

Further highlighting the conclusion that [Appellant] was acting in her own best interests, not [the decedent's], was her continued

silence during her and James's divorce. She knew [the decedent] wanted a third of his estate to go directly to his son. She knew the collective balance of his deposit accounts would have significantly increased the size of the estate. And she knew a divorce would ensure that James got none of that money.

Even assuming [Appellant] had convinced herself that [the decedent] did not want his money to pass through his estate, the only reasonable conclusion [Appellant] could have come to would have been that he wanted her **and** James to benefit from it, as she knew he believed even at the time of his death that they were still married. Even were it plausible that she was merely trying to honor [the decedent's] wishes when she **initially** accepted the benefit of being his designated beneficiary, therefore, her persistent failure to advise James even amidst would effectively contradict the notion that she continued to afford [the decedent's] interests . . . over her own.

Op. on Pet. & Objs. at 7-8 (emphases in original).

Appellant timely appealed from the January 11, 2019 order and complied with the trial court's order for her to file and serve a Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion stating that its findings of fact and credibility determination were supported by the record.

Appellant presents the following questions for review:

[1]. Did the [trial court] err in finding that Appellant had violated her duties under a [POA] from the decedent and that such violation invalidated [the decedent's] designation of Appellant as beneficiary of his [credit union] accounts, where the beneficiary designation was not the product of undue influence or weakened intellect?

[2]. Did the [trial court] err in failing to find that Appellant was the owner of [the decedent's credit union] accounts upon his death where [the decedent] had designated her as beneficiary of those accounts and there was no evidence of any contrary intent by [the decedent]?

Appellant's Brief at 5.

- 11 -

We summarize Appellant's arguments in support of her issues together. First, Appellant asserts that the trial court granted relief based on a theory that Whitney and James did not plead. *Id.* at 23. Second, Appellant argues that she did not violate the POA. *Id.* at 21. Third, Appellant claims that even if she breached her duties as POA, the trial court erred when it invalidated the beneficiary designation to the credit union accounts. Fourth, Appellant asserts that the trial court failed to apply the Multiple-Party Accounts Act (MPAA), 20 Pa.C.S. §§ 6301-6306. *Id.* at 39. We will address Appellant's arguments in more detail below.

Initially, we note that the following principles govern our review:

The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

When the trial court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. It is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of

record, discretion is abused. A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous.

We are not constrained to give the same level of deference to the orphans' court's resulting legal conclusions as we are to its credibility determinations. We will reverse any decree based on palpably wrong or clearly inapplicable rules of law. Moreover, we are not bound by the chancellor's findings of fact if there has been an abuse of discretion, a capricious disregard of evidence, or a lack of evidentiary support on the record. If the lack of evidentiary support is apparent, reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law. Nevertheless, we will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record.

*In re Jackson*, 174 A.3d 14, 23-24 (Pa. Super. 2017) (citation omitted).

**Relief Granted on Theory Not Raised In Appellees' Petition**

As to Appellant's first argument that the trial court granted relief on a theory not raised in Whitney and James's petition, Appellant notes the trial court rejected Whitney and James's claim that Appellant designated herself as the beneficiary of the credit union accounts. Appellant's Brief at 23-24. Appellant asserts that Whitney and James did not allege Appellant violated the POA, but that the trial court granted relief based on its findings that Appellant violated various duties as the decedent's agent. *Id.*

This Court has stated that "[u]nder Pennsylvania's fact pleading system, the complainant need only state the material facts upon which a cause of action is based. The duty to discover the cause or causes of action rests with the trial court." *Rellick-Smith v. Rellick*, 147 A.3d 897, 900 n.8 (Pa. Super.

- 13 -

2016) (citations and internal alterations omitted). Nevertheless, "[i]t has long been held that a court may not raise an issue *sua sponte* that does not involve the court's subject matter jurisdiction. Nor should a trial court act as a party's advocate." ***In re Estate of Tscherneff***, 203 A.3d 1020, 1026-27 (Pa. Super. 2019) (citations and internal alterations omitted).

Instantly, a review of Whitney and James's petition shows that they initially focused on claims that Appellant designated herself as the beneficiary of the credit union accounts and concealed facts regarding the beneficiary designation and deposits into the accounts. Alternatively, they asserted that Appellant unduly influenced the decedent to designate her as beneficiary of the accounts. Whitney and James stated that those actions violated Appellant's fiduciary duties to act in the interests of the decedent, particularly as it related to the proceeds from the sale of the farm and equipment. ***See*** Pet. at ¶¶ 19-27, 31-33; ***see also Rellick-Smith***, 147 A.3d at 900 n.8.

Subsequently, at the hearing on the petition, counsel for Whitney and James examined Appellant regarding the deposit of the decedent's funds into the credit union accounts and her failure to create a separate account. Counsel for Appellant did not object. Further, in response to Appellant's motion for non-suit, counsel for Whitney and James argued:

> It's also dealing with the powers as power of attorney knowing that situation over the 4 years when that account grew from $260,000 to $570,000 over the next 4 years and have a duty— that's why they changed the laws with agents as far as keeping assets separate, doing it for the benefit of the principal, not the agent. So you're not just talking that, what's happened on

- 14 -

February 14th, that the accounts were not the same as of January-February of 2018. So you have to couple that in that particular situation too that those accounts are growing and acting as the power of attorney during that time.

N.T., 12/20/18, at 191-92. Appellant did not object, and the trial court denied Appellant's motion for non-suit.

Therefore, even if Whitney and James failed to plead that Appellant breached the POA based on a conflict of interest or commingling assets, the trial court was entitled to consider the evidence and theories raised by Whitney and James at trial. In the absence of contemporaneous objections, we have no basis to grant relief on Appellant's assertion that the trial court granted relief on a theory not specifically pled by the Whitney and James. **Cf.** Pa.R.A.P. 302(a).

## Appellant's Second and Third Arguments

Appellant's second and third arguments are related, and we will address them together. Appellant essentially claims that the trial court erred in rescinding the beneficiary designation based on the alleged violations of the POA. Specifically, Appellant asserts that she faithfully performed her duties as the decedent's agent. Appellant contends that she did not commingle assets. **Id.** at 24-25. She asserts there was no inherent conflict of interest between her acting as the decedent's agent under the POA and her designation as beneficiary of the credit union accounts. **Id.** at 25-26 (citing 20 Pa.C.S. § 5601.3(c)(2)).

Appellant further claims that she had no duty to object to her designation as the beneficiary of the accounts and that it would be improper to refuse the decedent's instructions to deposit funds into the accounts. *Id.* at 27-28. Appellant emphasizes that her duties were "routine" and included making deposits, paying bills, bringing the decedent mail, and carrying out the decedent's instructions. *Id.* at 28. Appellant argues that she was not qualified to provide financial advice and did not assume a duty to inform the decedent of the possible differences between the distributions called for in the decedent's will and the beneficiary designation of the credit union accounts. *Id.* at 27-29. Appellant also asserts that she had no duty to inform the decedent that she divorced James or to tell James that she was the beneficiary of the accounts. *Id.* at 30-35.

Moreover, Appellant contends that the record did not support the trial court's finding that the decedent believed that she and James were still married. *Id.* at 31. She further argues that no evidence established that the decedent intended for James to share in the proceeds of the credit union accounts while James and Appellant were married. *Id.* at 31-32. Appellant also asserts that the trial court's determination that the decedent would have changed the beneficiary designation if he knew about the divorce was "purely speculative." *Id.* at 33.

Appellant further notes that the proper remedy for a violation of her duties as an agent was a surcharge and not the rescission of the beneficiary

designation of the accounts. *Id.* at 35. She asserts that any loss caused by a breach of the POA was too speculative to grant relief and that a rescission of the beneficiary designation was too severe a remedy. *Id.* at 37.

It is well settled that "[p]ower of attorney actions are governed by statute, 20 Pa.C.S.[ §§ 5601-5614 (the POA Act)]." *Rellick-Smith*, 147 A.3d at 904. Here, when the decedent executed the POA naming Appellant as his agent in February of 2014, Appellant's duties were outlined by the prior version of Section 5601, which read:

> **(e) Fiduciary relationship.—**An agent acting under a power of attorney has a fiduciary relationship with the principal. In the absence of a specific provision to the contrary in the power of attorney, the fiduciary relationship includes the duty to:
>
> > (1) Exercise the powers for the benefit of the principal.
> >
> > (2) Keep separate the assets of the principal from those of an agent.

20 Pa.C.S. § 5601(e)(1)-(2) (subsequently amended eff. Jan. 1, 2015).

The current version of POA Act codifies the 2014 amendments which became effective January 1, 2015. *See* 2014, July 2, P.L. 855, No. 95 (Act 95), §§ 3, 9 (eff. Jan. 1, 2015). Currently, Section 5601.3 defines the duties of an agent as follows:

> **(a) General rule.—**Notwithstanding any provision in the power of attorney, an agent that has accepted appointment shall:
>
> > (1) Act in accordance with the principal's reasonable expectations to the extent actually known by the agent and, otherwise, in the principal's best interest.
> >
> > (2) Act in good faith.

* * *

**(b) Other duties.—**Except as otherwise provided in the power of attorney, an agent that has accepted appointment shall:

(1) Act loyally for the principal's benefit.

(1.1) Keep the agent's funds separate from the principal's funds unless:

(i) the funds were not kept separate as of the date of the execution of the power of attorney; or

(ii) the principal commingles the funds after the date of the execution of the power of attorney and the agent is the principal's spouse.

(2) Act so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest.

(3) Act with the care, competence and diligence ordinarily exercised by agents in similar circumstances.

* * *

(6) Attempt to preserve the principal's estate plan, to the extent actually known by the agent, if preserving the plan is consistent with the principal's best interest based on all relevant factors, including:

(i) The value and nature of the principal's property.

(ii) The principal's foreseeable obligations and need for maintenance.

(iii) Minimization of taxes, including income, estate, inheritance, generation-skipping transfer and gift taxes.

(iv) Eligibility for a benefit, program or assistance under a statute or regulation.

**(c) Nonliability of agent.—**

(1) An agent that acts in good faith shall not be liable to a beneficiary of the principal's estate plan for failure to preserve the plan.

(2) An agent that acts with care, competence and diligence for the best interest of the principal shall not be liable solely because the agent also benefits from the act or has an individual or conflicting interest in relation to the property or affairs of the principal.

20 Pa.C.S. § 5601.3(a), (b)(1)-(3), (6), (c)(1)-(2).[4]

Pennsylvania courts have recognized that

_____

[4] Section 9 of Act 95 provides:

(1) Except as provided by this section, the provisions of this act apply to powers of attorney created before, on or after the respective effective dates of such provisions, but do not apply to the acts or omissions of agents, or third parties presented with instructions by agents, that occur before such respective effective dates.

(2) Except as provided by this section, the provisions of this act apply to judicial proceedings concerning a power of attorney commenced before, on or after the respective effective dates of such provisions, unless the court finds that application of a provision of this act would substantially interfere with the effective conduct of the judicial proceeding or prejudice the rights of a party, in which case that provision does not apply and the superseded law applies.

2014, July 2, P.L. 855, No. 95, § 9.

Appellant and the decedent executed the POA in this appeal before Act 95 was enacted. Therefore, the POA recited the duties listed in former Section 5601(e). Nevertheless, Appellant does not dispute that Act 95 applies. Appellant, as noted above, expressly relies on the non-liability provision of Act 95 to support her claim that she was entitled to the full amount of the credit union accounts at the time of the decedent's death. *See* Appellant's Brief at 26.

the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and the "agent must act with the utmost good faith in the furtherance and advancements of the interests of his principal." This duty is the same as that of fiduciary which has been described as the duty to act for the benefit of another as to matters within the scope of the relation.

*In re Shahan*, 631 A.2d 1298, 1303 (Pa. Super. 1993) (citations omitted).

This Court summarized the following principles governing a breach of a fiduciary duty in the context of an estate:

"Executors, as well as other fiduciaries, are under an obligation to make full disclosure to beneficiaries respecting their rights and to deal with them with utmost fairness." The Supreme Court has elaborated accordingly that:

He that is entrusted with the interest of others, cannot be allowed to make the business an object of interest to himself; because from the frailty of nature, one who has the power[ ] will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of others for whom he is entrusted.

Thus, the rule forbidding self-dealing serves both to shield the estate and its beneficiaries and ensures the propriety of the executor's conduct. Consequently, "the rule is inflexible, without regard to the consideration paid, or the honesty of intent."

Moreover, a finding of prohibited self-dealing need not be premised on a showing of loss to the estate:

The test of forbidden self-dealing is whether the fiduciary had a personal interest in the subject transaction of such a substantial nature that it might have affected his judgment in a material connection . . . [T]he fiduciary's disqualifying interest need not be such as 'did affect his judgment' but merely such as 'might affect his judgment.'

*In re Estate of Harrison*, 745 A.2d 676, 679 (Pa. Super. 2000) (citations and emphasis omitted).

"[S]urcharge is the penalty for failure to exercise common prudence, common skill and common caution in the performance of the fiduciary's duty and is imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care." **In re Estate of Bechtel**, 92 A.3d 833, 839 (Pa. Super. 2014) (citation omitted). "Once self-dealing is established, a surcharge may be applied to a fiduciary, not as compensation for any loss to the estate, but as punishment for the fiduciary's improper conduct." **Harrison**, 745 A.2d at 680 (citation omitted).

Instantly, the essence of the trial court's decision was that Appellant acted in a manner as to create a conflict of interest that impaired her ability to act impartially in the principal's best interest.[5] **See** Op. on Pet. & Objs. at

---

[5] To the extent Appellant argues that that she did not specifically violate a duty prohibiting the commingling of funds and that her duties under the POA were ministerial, we agree. **See** Op. on Pet. & Objs. at 7 (noting that the evidence did not indicate that Appellant was depositing her own income into the account or improperly transferred funds out of the account). Furthermore, the findings of the trial court suggest that the decedent remained competent to arrange his financial affairs even after the sale of the farm and equipment in 2014. **See id.** at 4-5. For example, the trial court found that the decedent instructed Appellant to deposit the proceeds of the sale of the farm and equipment into the credit union accounts. **See id.** at 4-5. We also agree that Appellant did not owe James a direct legal duty under the POA. Rather, Appellant owed the decedent a duty to attempt to preserve the decedent's estate plan. **See** 20 Pa.C.S. § 5601.3(b)(6). To the extent Appellant relies on the non-liability provision of the POA Act, we agree with Appellant that there was no inherent conflict of interest at the time the decedent initially designated Appellant as the beneficiary of the credit union accounts. However, as stated above, the trial court's ultimate finding was that Appellant was acting under a conflict of interest with respect to the growth of the accounts.

8; 20 Pa.C.S. § 5601.3(b)(2). In that regard, we conclude that the record supports the trial court's findings of fact. Appellant was aware that she was the sole beneficiary of the credit union accounts, but under the January 6, 2014 will, was also a one-third beneficiary of the residue of the decedent's estate, along with Whitney and James. *See* Op. on Pet. & Objs. at 8; *see also* N.T., 12/20/18, at 265, 279, 318.

Appellant permitted the account to grow without consulting with the decedent as to his precise intention as to his estate. *See* Op. on Pet. & Objs. at 8; *see also* N.T. at 173, 183, 314-15. As a notable example, the proceeds of the sale of the farm and equipment constituted a significant portion of the decedent's assets. *See* Op. on Pet. & Objs. at 8. Although the decedent instructed Appellant to deposit the funds, Appellant knew that she could be entitled to the funds on the decedent's death and did not question the decedent's instructions to deposit the proceeds of the sale of the farm and equipment. *See id.*; *see also* N.T. at 149-50.

As the trial court found, Appellant did not inform the decedent of her divorce from James. *See* Op. on Pet. & Objs. at 8. Appellant instead remained silent before, during, and after her divorce even as the credit union accounts continued to grow. *See id.* By withholding this information, Appellant potentially deprived the decedent of the opportunity to make his own informed decision as to how to allocate his assets. *See id.* Therefore, the trial court

determined that Appellant was not only impaired by the conflict of interest, but began "acting in her own best interests." *See id.*

Following our review, we conclude that the record supports the trial court's finding that Appellant acted in a manner as to create a conflict of interest under 20 Pa.C.S. § 5601.3(b)(2). *See Jackson*, 174 A.3d at 23-24. Furthermore, we find no abuse of discretion or legal error in the trial court's determination that Appellant ultimately placed her own self-interests ahead of those of the decedent. *See id.* Under these circumstances, we find no basis to disturb the trial court's decision to direct Appellant to restore the credit union accounts to the decedent's estate for distribution as a surcharge for the conflict of interest. *Cf. Harrison*, 745 A.2d at 680 (discussing a surcharge as punishment for a fiduciary's misconduct). Accordingly, Appellant's second and third arguments merit no relief.

### Application of MPAA

Lastly, as to Appellant's claim that the trial court failed to consider the MPAA properly, Appellant contends that absent clear and convincing evidence of the decedent's contrary intent, she had a statutory right of survivorship in the credit union accounts. Appellant's Brief at 39-40 (discussing 20 Pa.C.S. § 6304(b)). Appellant concludes that Whitney and James failed to meet the clear and convincing standard to invalidate her designation as the beneficiary to the accounts. *Id.* at 41-45 (discussing *In re Novosielski*, 992 A.2d 89

(Pa. 2010), *In re Estate of Strahsmeier*, 54 A.3d 359 (Pa. Super. 2012),

and *In re Estate of Cella*, 12 A.3d 374 (Pa. Super. 2010)).

By way of background, the MPAA governs multiple party accounts, which

it defines as "either a joint account or a trust account."  20 Pa.C.S. § 6301.

The MPAA defines a "trust account" as follows:

> [A]n account in the name of one or more parties as trustee for
> one or more beneficiaries where the relationship is established by
> the form of the account and the deposit agreement with the
> financial institution and there is no subject of the trust other than
> the sum on deposit in the account; it is not essential that payment
> to the beneficiary be mentioned in the deposit agreement.  A trust
> account does not include a regular trust account under a
> testamentary trust or a trust agreement which has significance
> apart from the account, or a fiduciary account arising from a
> fiduciary relation such as attorney-client.

20 Pa.C.S. § 6301.

The MPAA states the following rules regarding survivorship:

> **(b) Trust account.—**At the death of the trustee or the survivor
> of two or more trustees, any sum remaining on deposit belongs to
> the person or persons named as beneficiaries, if surviving, or to
> the survivor or survivors of them if one or more die before the
> trustee or last surviving trustee, **unless there is clear and
> convincing evidence of a contrary intent**; if two or more
> beneficiaries survive, there is no right of survivorship in event of
> death of any beneficiary thereafter unless the terms of the account
> or deposit agreement expressly provide for survivorship between
> them.
>
> **(c) Other cases.—**In other cases, the death of any party to a
> multiple-party account has no effect on beneficial ownership of the
> account other than that the rights of the decedent become part of
> his estate.
>
> **(d) Change by will prohibited.—**A right of survivorship arising
> from the express terms of an account or under this section, or a

beneficiary designation in a trust account cannot be changed by will.

20 Pa.C.S. § 6304(b)-(d) (emphasis added). The MPAA directs that the form of the account at the time of the death of a party will determine the applicability of Section 6304. 20 Pa.C.S. § 6305.

The MPAA is intended to "reduce certain questions concerning many forms of joint accounts and the so-called Totten trust account."[6] 20 Pa.C.S. § 6301 cmt. Our Supreme Court has stated that that the MPAA "evidences a

_____

[6] *Cf. In re Totten*, 71 N.E. 748 (N.Y. 1904). Our Supreme Court described a Totten trust as follows:

If a person makes a deposit in a savings bank in his own name as trustee for another person, intending to reserve a power to withdraw the whole or any part of the deposit at any time during his lifetime and to use as his own whatever he may withdraw, or otherwise to revoke the trust, the intended trust is not a testamentary trust and is enforceable by the beneficiary upon the death of the depositor as to any part remaining on deposit on his death if the depositor has not revoked the trust. [I]t is stated: 'If a person makes a deposit in a savings bank in his own name 'as trustee' for another person, his intention may be either (1) to create a revocable trust, (2) to create an irrevocable trust, or (3) not to create a trust. Evidence may be admitted to show which was his intention. In the absence of evidence of a different intention of the depositor, the mere fact that a deposit was made in a savings bank in the name of a depositor 'as trustee' for another person is sufficient to show an intention to create a revocable trust. To such a trust the principle stated in this section is applicable. The depositor may at any time withdraw any part of the deposit during his lifetime, or otherwise revoke the trust in whole or in part at any time during his lifetime, or by will, but on his death the beneficiary is entitled to the amount remaining on deposit if the depositor has not revoked the trust.

*In re Scanlon's Estate*, 169 A. 106, 108 (Pa. 1933).

legislative intent that, except when the instrument explicitly provides to the contrary or in the unusual case based on a heightened degree of evidence, individuals and institutions may safely rely upon the presumed right of survivorship of MPAA joint accounts." *Novosielski*, 992 A.2d at 102; *see also In re Meyers*, 642 A.2d 525, 528 (Pa. Super. 1994) (holding, "the [MPAA] favors the surviving party over the estate of the decedent.").

In *Novosielski*, our Supreme Court resolved, among other issues, whether the record established fraud and undue influence that would defeat the MPAA's presumption of survivorship. *Novosielski*, 992 A.2d at 97. Briefly, the decedent designated the appellant as beneficiary of the accounts at issue and also devised 10% of the estate to the appellant. *Id.* at 96. The lower courts held that the accounts at issue belonged to the estate and not the appellant. *Id.* at 93-94. The *Novosielski* Court reversed, reasoning that the appellee "failed to present any evidence 'so clear, direct, weighty, and convincing' that the fact-finder could come, without hesitation, to a clear conviction that a right of survivorship was not intended by [the d]ecedent." *Id.* at 107.

In *In re Cella*, 12 A.3d 374 (Pa. Super. 2010), the decedent and the appellant opened joint bank accounts with the right of survivorship, which the decedent solely funded. *Cella*, 12 A.3d at 376. The orphans' court held that the appellant was not the owner and "had no right of survivorship in the bank accounts as against" the estate. *Id.* The *Cella* Court reversed, reasoning

that "the record does not support the court's decision to override the MPAA, where [the estate] failed to prove by clear and convincing evidence that [the d]ecedent had an intent contrary to [the a]ppellant's right of survivorship when he created the joint accounts." *Id.*

In *Strahsmeier*, the Court resolved whether the record contained clear and convincing evidence sufficient to overcome the presumption that the decedent intended that the proceeds of the bank account at issue should pass to the beneficiary and not to the estate. *Strahsmeier*, 54 A.3d at 363 n.16. The *Strahsmeier* Court distinguished *Novosielski* and *Cella* and held that the record contained detailed, extensive documentation and testimony that the decedent intended that the bank account pass to the estate. *Id.* at 364-65. The *Strahsmeier* Court therefore affirmed the orphans' court determination that there was "clear and convincing evidence that [the d]ecedent had an intent contrary to" the beneficiary's right of survivorship. *Id.* at 367.

Instantly, the decedent designated Appellant as the beneficiary of the credit union account in February of 2014. After careful consideration, we conclude that the facts of this case are closer to the facts of *Novosielski* and *Cella* and are distinguishable from the facts of *Strahsmeier*. As set forth above, the instant decedent (1) established the joint credit union accounts at issue, (2) personally notified the bank to designate Appellant as the sole designated beneficiary on the same day he gave Appellant the POA, and (3)

instructed Appellant on managing the accounts in detail. *See* Op. on Pet. & Objs. at 1-5.

Similar to the appellant in *Novosielski*, the decedent devised Appellant a smaller share of the estate, when Appellant would receive more as the sole beneficiary of the accounts at issue. *See id. Cf. Novosielski*, 992 A.2d at 96. Identical to the decedent in *Cella*, the instant decedent solely funded the accounts at issue. *Cf. Cella*, 12 A.3d at 376. Similar to the decedent in *Cella*, who opened the joint bank accounts with the right of survivorship, the instant decedent notified Appellant that upon his death she would be the sole owner of the accounts. *See* Op. on Pet. & Objs. at 3. *Cf. Cella*, 12 A.3d at 376. Unlike the extensive documentation and testimony in *Strahsmeier*, which established that the bank account would pass to the estate, the instant record established that only Appellant had the right of survivorship. *Cf. Strahsmeier*, 54 A.3d at 364. Because the trial court erred in disregarding the absence of clear and convincing evidence of a contrary intent, the trial court did not apply the MPAA properly and we reverse that portion of the trial court's order. *Cf. Novosielski*, 992 A.2d at 103, 107; *Cella*, 12 A.3d at 382-83.

As discussed herein, we agree with the trial court's determination that Appellant had a conflict of interest under the POA which was supported by the record and free of legal error. However, the trial court erred by applying a surcharge against Appellant pursuant to the MPAA. Clear and convincing

evidence of the decedent's intent in the record establishes that Appellant is the beneficiary of the credit union accounts at issue. Further, the trial court found that Appellant did not unduly influence the decedent when he signed the POA or when he designated Appellant as the beneficiary of the credit union accounts, nor did the trial court find fraud. For these reasons, we reverse the part of the trial court's order directing Appellant to restore the accounts at issue to the decedent's estate for distribution and affirm the remainder of the order.

Order affirmed in part and reversed in part.

Judge Musmanno joins the memorandum.

Judge Bowes files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/13/2021